**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

**FBT GIBBONS LLP**
Thomas R. Valen, Esq.
John S. Mairo, Esq.
William S. Hatfield, Esq.
Christopher P. Anton, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
Email: tvalen@fbtgibbons.com
jmairo@fbtgibbons.com
whatfield@fbtgibbons.com
canton@fbtgibbons.com

*Attorneys for Boraie Development, LLC and Milltown Ford Avenue Redevelopers*

| | |
|---|---|
| IN RE:<br><br>SB BUILDING ASSOCIATES LIMITED PARTNERSHIP, SUCCESSOR BY MERGER TO SB MILLTOWN INDUSTRIAL REALTY HOLDINGS, LLC, AND ALSOL CORPORATION,<br><br>DEBTOR. | (Honorable Vincent F. Papalia)<br><br>Chapter 11<br><br>Case No. 22-14231 (VFP) |

**JOINT MOTION OF BORAIE DEVELOPMENT LLC AND MILLTOWN FORD AVENUE REDEVELOPERS, PURSUANT TO PARAGRAPH 8 OF THE JUNE 10, 2026 ACCESS ORDER, AUTHORIZING DISCLOSURE OF ENVIRONMENTAL TEST RESULTS AND RELATED ESTIMATED REMEDIATION COSTS**

Boraie Development LLC ("**BD**") and Milltown Ford Avenue Redevelopers ("**Redeveloper**" and, together with BD, "**Boraie**"), by and through their undersigned counsel, respectfully move, pursuant to paragraph 8 of the June 10, 2026 *Order Granting, in Part, the Joint Motion of Boraie Development LLC and Milltown Ford Avenue Redevelopers, Pursuant to Fed. R. Bankr. P. 2004, 7034 & 9014, D.N.J. LBR 2004-1 and 11 U.S.C. §105(a), for (A) Entry of an*

*Order Authorizing Examination of Debtor's Real Property Regarding Environmental Conditions, or Alternatively (B) Granting Movants' Request for Entry onto, and Environmental Testing of, the Debtor's Real Property and Denying the Debtor's Cross-Motion* (the "**Access Order**") [ECF No. 293], for the entry of an Order, in the form submitted herewith, authorizing Boraie's disclosure of the results of the environmental testing conducted under the Access Order and related estimated remediation costs, and in support of their motion (the "**Motion**") respectfully state:

## PRELIMINARY STATEMENT

1. This Motion would not be necessary if the Debtor had put its selfish motives and desire for secrecy aside and conducted itself with the transparency and full disclosure that is fundamental to the bankruptcy process. That transparency was lacking at the outset of this case, when the Debtor provided false and misleading statements about environmental matters in its Statement of Financial Affairs, and it persists to this day with the Debtor's stubborn refusal to consent to the disclosure of the results of Boraie's environmental testing at a time when the environmental conditions at the Property (defined below) and potential remediation costs are of paramount importance to the Chapter 11 plan and disclosure process.

2. The Debtor not only is attempting to keep creditors, environmental regulatory agencies, the Office of the United States Trustee, and other parties in interest in the dark. It has denied Boraie's request for consent to file the environmental testing results and related estimated remediation costs with this Court *under seal*, declaring: "none of your information can be disclosed to the Judge as part of your motion on the disclosure issue."[1] Apparently, the Debtor is fearful that if the Court were to see the testing results and cost estimate, the Court would be more inclined to

[1] *See* email from Morris S. Bauer, Esq. to John S. Mairo, Esq. dated September 24, 2026, attached to the Declaration of Thomas R. Valen dated October 2, 2026 (the "**Valen Decl**."), as Exhibit 1.

authorize their disclosure and/or confirm Boraie's proposed Chapter 11 plan. There is no reason to shield the testing results from the Court's impartial eyes. They should be part of the judicial record in this case. Nevertheless, Boraie would be willing to at least initially file them under seal so the Court may see for itself why broader disclosure of the testing results and related estimated remediation costs should be permitted.

3. Boraie sought and obtained the Access Order for the stated purpose of undertaking a three-part process to bring this four year-old Chapter 11 case (the Debtor's second bankruptcy case) to a conclusion. Under that process, after inspecting and testing the Debtor's Property to assess the environmental conditions (Step 1), Boraie would consider the inspection/testing results, and coordinate with the New Jersey Department of Environmental Protection ("**NJDEP**"), to determine what remediation will be required and how that impacts the value of the Property, and would make a revised bid for the Property based upon those results and cost estimates (Step 2). If the scope and estimated cost of the required remediation made it economically feasible, Boraie would submit a Chapter 11 plan consistent with the revised bid (Step 3).

4. The Debtor sought to limit Boraie's disclosure of the testing samples and results in the form of the Access Order, but paragraph 8 expressly provides that disclosure may occur by consent of the Debtor, by further order of this Court, or as otherwise required by law after notice and hearing.

5. Pursuant to the Access Order, on July 27, 2026, Boraie provided Debtor with a copy of the testing results prepared by a New Jersey Certified Laboratory that evaluated the samples that Boraie collected. In addition, Boraie had, at the time of sampling, provided Debtor with split samples of the materials it collected so that Debtor could perform an independent environmental analysis, if it chose to do so.

6. Had Boraie opted not to file a Chapter 11 plan premised on its purchase of the Property, it might make sense to require Boraie to continue to keep the environmental testing results to itself and to leave it up to the Debtor to decide whether and how to disclose the results, consistent with its fiduciary duties as a debtor in possession and whatever obligations may exist under any other applicable law. But now that Boraie has moved forward with its proposed Chapter 11 plan, the current environmental conditions at the Property and potential remediation costs bear directly on the Bankruptcy Code's Chapter 11 plan disclosure requirements, the Property's valuation, plan feasibility, and other matters material to the disclosure statement and plan confirmation process.

7. Boraie is not alone in its desire to allow its environmental testing results and related estimated remediation costs to be disclosed. Counsel for secured creditors Sass Muni VI, LLC, Sass Muni V, LLC, Sass Muni IV, LLC, Cherry Tree Property, L.L.C. spoke in favor of disclosure at the September 23, 2026 status conference and stated, "I think the other secured creditors feel the same way." *See* Valen Decl, Exhibit 2 (copy of transcript of the September 23, 2026 status conference), at T11:19 to T12:3. Counsel for the U.S. Environmental Protection Agency ("**US EPA**"), also a secured creditor, stated at the status conference that disclosure is "essential." *Id*. at T14:11-19.

8. It is time to lift the arbitrary veil of secrecy surrounding the testing results and allow this Court, creditors, environmental regulators, and any other interested parties to make informed decisions regarding the Property and about how to resolve this bankruptcy case based upon all relevant facts.

## <u>JURISDICTION AND VENUE</u>

9. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the *Standing Order of Reference* from the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## <u>BACKGROUND</u>

10. On May 25, 2022 (the "**<u>Petition Date</u>**"), the Debtor filed a petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "**<u>Bankruptcy Code</u>**"). The Debtor continues to operate as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11. The Debtor owns property consisting of approximately 22 acres of land and improvements bordering Ford Avenue in Borough of Milltown, New Jersey (the "**<u>Property</u>**"). In 2001, the Borough of Milltown ("**<u>Milltown</u>**") designated the Property as blighted and in need to redevelopment.

12. Milltown adopted a Redevelopment Plan for the Property on April 22, 2002. The Milltown Ford Avenue Redevelopment Agency (the "**<u>Agency</u>**") thereafter issued a request for proposals to undertake the redevelopment. BD was selected and entered into a Redevelopment Agreement with the Agency in 2004 and thereafter assigned its redevelopment rights to Redeveloper. Since that time, Boraie has undertaken extensive efforts to obtain approvals and permits that would allow it to redevelop the Property in a manner consistent with the goals of Milltown and the public. Consistent with New Jersey law, Boraie has had and continues to have sole authority to undertake a redevelopment project on the Property.

13. The Debtor was involved in litigation filed by the US EPA in 2009 based upon the Debtor's failure to conduct certain environmental remediation. *See United States v. Alsol Corp.*, Dkt. No. 2:09-cv-03026 (D.N.J.).

14. On Official Form 201 (the bankruptcy petition), signed under penalty of perjury by Lawrence S. Berger as the principal of the Debtor on May 25, 2022, the Debtor checked "No" as its answer to the following question: "Does the debtor own or have possession of any real property or personal property that needs immediate attention?" (Case No. 22-14231, ECF. No. 1; *see also* Case No. 22-14233, ECF No. 1; Case No. 22-14234, ECF No. 1). In the Debtor's Statements of Financial Affairs filed under penalty of perjury, Mr. Berger answered each of the following questions (three times) as "No."

> 22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?
>
> 23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?
>
> 24. Has the debtor notified any governmental unit of any release of hazardous material?

*See* Case No. 22-14231, ECF No. 18 at 22; *see also* Case No. 22-14233, ECF No. 17 at 19; Case No. 22-14235, ECF No. 17 at 20.

15. On April 20, 2023, the New Jersey Department of Environmental Protection ("**NJDEP**") filed an action against the Debtor, Mr. Berger, and others in the Superior Court of New Jersey seeking recovery of costs it had incurred in remediating a 2016 spill of transformer oil containing PCBs on the Property and in adjacent bodies of water (the "**NJDEP Action**"). The NJDEP Action was docketed in the Superior Court for Middlesex County as MID-L-2227-23. The complaint stated that in October 2016 the NJDEP had informed Mr. Berger that he and/or the entities he controls which owned the Property were obligated to remediate the spill, but that he had

refused to do so. (Valen Decl., Exhibit 3 (copy of NJDEP Verified Complaint), at ¶¶ 5, 33-35). The NJDEP's complaint further alleges that "The PCBs in the transformer oil are also a hazardous substance and have been linked to a variety of cancers, skin conditions, adverse changes to the liver and thyroid, and neuro-developmental and neurobehavioral changes, posing a threat to public health and the environment." NJDEP Complaint at ¶ 3.

16. In the meantime, a Condemnation Action (Case No. 19-cv-21494, D.N.J.) ("**Condemnation Action**") against the Debtor (and other interest holders) was tried before a jury in the United States District Court for the District of New Jersey from September 4, 2024 through September 11, 2024, following extensive pre-trial motions and other proceedings. (Condemnation Action, ECF Nos. 241-251). The jury valued the property at $26,900,000 without offsets or deductions and arrived at a just compensation award of $25,650,000 (the "**Compensation Award**"), after deducting $1,250,000 for its assessment of the likely costs of demolition and removal of certain debris from the site. Consistent with well-established condemnation law,[2] the jury's valuation was as if the Property was already remediated to address all environmental contamination (*i.e.*, without any reduction in value based upon the environmental cleanup that must be conducted in the future). (Condemnation Action, ECF No. 264 at p. 3). On September 27, 2024, the District Court entered judgment in favor of the Debtor in the amount of $25,650,000, plus post-judgment interest at the rates specified in 28 U.S.C. § 1961. D.N.J., Case No. 3:19-cv-21494 [ECF No. 264].

17. On August 13, 2025, the Bankruptcy Court entered an Order requiring the Agency to deposit the Compensation Award, plus accrued interest, by October 6, 2025 and irrevocably

[2] *See e.g., Housing Authority of City of New Brunswick vs. Suydam Investors, LLC,* 177 N.J. 2 (2003) and *New Jersey Transit v. Cat in the Hat, LLC,* 177 N.J. 29 (2003).

take title to the Property, or abandon the Condemnation Action. The Compensation Award was not deposited. Consequently, the Agency abandoned the Condemnation Action.

18. The Agency abandoned the condemnation not because of any change in policy or unwillingness to pay the amount of the jury verdict, but rather because the Debtor had failed to disclose that, because of Mr. Berger's misconduct and refusal to comply remedial timeframes under New Jersey law, compulsory direct oversight ("**Direct Oversight**" or "**DO**") was triggered for the Property under NJDEP's regulations (N.J.A.C. 7:26C-14). Once DO is triggered, it applies to all environmental contamination related to the Property, both on and off-site. In addition, once the Property became subject to Direct Oversight, it is always a DO case, as the statute provides no off ramp from that regulatory status other than entry into a Pre-Purchase Administrative Consent Order ("**ACO**"). Moreover, this status runs with the Property, so the Agency (and then Boraie) would be liable under the Spill Act for all obligations, liabilities and costs that the Spill Act and the DO status imposes upon property owners. *See* Valen Decl., Exhibit 4 (copy of November 7, 2025 letter to Mr. Valen from Ann H. Wolf, Assistant Director, Enforcement and Information Support Element of the NJDEP).

19. Because the Property is subject to DO, it means the NJDEP itself must select the remediation plan for the Property, thus depriving the owner of both control and decision-making over the cleanup process. As a result, NJDEP Direct Oversight complicates the remediation of the Property and increases cleanup costs, rendering all prior assessment of environmental risks and clean-up costs unreliable. Under DO, NJDEP itself will make the determination of what must be done and directs the level of environmental cleanup required both on and off the Property, and also requires that a Remediation Trust Fund be established for the full cost estimate for cleanup. *See*

Exhibit 4 (November 7, 2025 NJDEP letter); Exhibit 5 (copy of NJDEP's *Pre-Purchase Administrative Consent Order Guidance* publication).

20. Boraie and the Agency only became aware of the DO status of the Property in late September of 2025. In particular, on June 18, 2025, the NJDEP had filed a motion for summary judgment in its cost recovery action against the Debtor and Mr. Berger. Papers filed in support of that motion disclosed that in 2016 the NJDEP had issued field directives to Mr. Berger and imposed other obligations regarding the remediation of the Property, and that Mr. Berger had refused to comply. *See* Valen Decl., Exhibit 4 (November 7, 2025 NJDEP letter stating that the Debtor's failure to comply with its obligations "triggered compulsory direct oversight" as several "mandatory timeframes were missed" for, *inter alia*, submission of remedial investigation and remedial action reports) at p. 2. In light of those directives and obligations, the Debtor and Mr. Berger's representations regarding the environmental condition of the Property quoted above (Case No. 22-14231, ECF No. 18 at 22; Case No. 22-14233, ECF No. 17 at 19; Case No. 22-14235, ECF No. 17 at 20.), were false.[3]

21. On September 25, 2025, a Licensed Site Remediation Professional ("**LSRP**") retained by the Boraie advised that it had reviewed the documents filed with the NJDEP's recent

---

[3] By email dated September 28, 2026, Mr. Berger advised this Court that cross-motions for summary judgment in the NJDEP Action "were heard on Friday, 9/25 before Judge Bradshaw in Middlesex County, and the DEP's motion for summary judgment was denied and ours was granted." However, Mr. Berger neglected to tell the Court the basis for that decision. The decision was based solely upon the fact that the NJDEP's emergency responders mixed the spilled oil they collected in the same container with oil that they drained from the transformers that did not leak, and the oil that tested positive for PCBs came from that combined container. As such, the State Court ruled that the NJDEP has no evidence that could enable it to prove that the PCBs came from the transformer that spilled, rather than one that did not. *See* Transcript (attached to the Valen Decl. as Exhibit 6) at T8:8 to 9:6; T15:19 to17:5; T38:18 to 39:3. The decision in no way suggested that there was no contamination on the Property. The test results that are the subject of this motion for disclosure were not disclosed to the State Court judge. Nor does the decision excuse the Debtor's and Mr. Berger's lack of veracity in the Debtor's petition documents. On October 1, 2026, Mr. Berger filed a letter with this Court enclosing copies of the State Court's orders on the cross-motions for summary judgment in the NJDEP Action [ECF No. 327]. Neither Mr. Berger's September 28, 2026 email nor his October 1, 2026 letter disclosed the reasons for the State Court's decisions.

motion for summary judgment in the cost recovery action, MID-L-2227-23, and in so doing learned and reported to Boraie that the Property was subject to Direct Oversight by the NJDEP. *See* February 20, 2026 Declaration of Wasseem Boraie in support of Access Motion [ECF No. 250-3] ("**Boraie Decl.**"), p. 2, at ¶¶ 2-4. Until that time, although Boraie had been aware of the NJDEP Action, Boraie had been unaware that the Property was subject to DO. *See id.* Once Boraie learned that the Property was under NJDEP DO, it could no longer reasonably rely upon the estimates of the scope of work or costs of remediation that had been prepared by its consultants as if the work would be subject only to LSRP oversight. *See id.*

22. As the Court had ordered the Agency to elect to irrevocably take title to the Property or abandon the condemnation by October 6, 2025 and declined to extend that deadline, and as the Agency and Boraie could not complete a remediation plan with the NJDEP by that deadline due to the Property being under DO, the Agency and Boraie had no realistic option other than to abandon.

23. Notwithstanding all of the above, after October 2025 Boraie continued to conduct diligence regarding the scope of environmental remediation necessary for the Property, including working directly with the NJDEP on a plan that would allow them to enter into an ACO, which in turn should allow for certain adjustments to the DO requirements and remediation required by the NJDEP. The ACO would allow Boraie to take title to the Property and set new timeframes for completing the cleanup under NJDEP oversight without the full extent of the costs and risks imposed by the Property being under DO. *See* Boraie Decl., at ¶ 5. See Valen Decl., Exhibit 4 (November 7, 2025 NJDEP letter); Exhibit 5 (NJDEP's *Pre-Purchase Administrative Consent Order Guidance*).

24. To complete the environmental testing necessary to move the process (and this Chapter 11 case) forward, and after several unsuccessful attempts to obtain the Debtor's consent to allow such testing, on February 20, 2026, Boraie filed a *Joint Motion, pursuant To Fed. R. Bankr. P. 2004, 7034 & 9014, D.N.J. LBR 2004-1 and 11 U.S.C. § 105(a), for (a) Entry of an Order Authorizing Examination of Debtor's Real Property Regarding Environmental Conditions, or alternatively (b) Granting Movants' Request for Entry onto, and Environmental Testing of, the Debtor's Real Property* [ECF No. 250] (the "**Access Motion**").

25. The Debtor opposed the Access Motion and filed a *Cross-Motion for the Entry of an Order* Quashing *Subpoena for Examination Pursuant to Fed. R. Bankr. P. 2004 and Notice of Request for Entry on to Debtor's Land For Inspection and Environmental Testing Pursuant to Fed. R. Bankr.P. 7034 and 9014 and Related Relief* [ECF No. 258] (the "**Cross-Motion**").

26. The Bankruptcy Court held a hearing on the Access Motion and the Cross-Motion on April 28, 2026, at which the Bankruptcy Court announced its decision: (1) granting the Access Motion in part to allow the movants to enter onto the Debtor's Property to conduct certain limited sampling and environmental testing; and (2) denying the Cross-Motion.[4] The Bankruptcy Court also set July 3, 2006 as the deadline for parties in interest to file a plan and disclosure statement.

27. On June 10, 2026, the Bankruptcy Court entered the Access Order. The lengthy (six-week) gap between the April 28, 2026 hearing and the entry of the Access Order was due to the Debtor's persistent foot dragging and uncooperativeness in agreeing with Boraie on the form

---

[4] To be clear, the limited testing permitted under the Access Order order was by no means sufficient to fully assess the extent of environmental contamination on the Property or to determine the maximum amount that it will actually cost to remediate the Property. It was only sufficient to allow an estimate of the cost of remediation of the contamination that has been tested for and discovered (either in 2026 or previously), and to rule out with a reasonable degree of certainty the type of catastrophic contamination (particularly in the waterways) that would cause the cost of remediation to exceed the value of any sort of plausible permitted development of the Property.

of the Access Order, as detailed in Boraie's May 20, 2026, May 21, 2026, June 5, 2026, and June 9, 2026 letters to the Court [ECF Nos. 285, 287, 290 and 292].

28. The Access Order provides in relevant part:

> 6. All samples shall at the time of taking be split with the Debtor.
>
> 7. Boraie shall (i) share with the Debtor all testing results obtained by Boraie from the Transformer Spill Samples and Debris Samples (the "Boraie Test Results") and (ii) restore the areas where the samples are taken to their original condition.
>
> 8. Boraie, its employees, agents, representatives shall not provide the Boraie Test Results, the Transformer Spill Samples or the Debris Samples to any other persons or governmental unit, as such terms are defined in the Bankruptcy Code, unless consented to by the Debtor or by further order of this Court or as otherwise may be required by law after notice and hearing, except that nothing herein shall prevent Boraie from sharing the Boraie Test Results with its counsel or its consultants retained in connection with this matter.

29. The Access Order also extended the deadline to file a plan and disclosure statement to August 14, 2026. Access Order, ¶ 9.

30. Commencing on or around June 29, 2026, Boraie's environmental consultants took samples from the Property and split them with the Debtor.

31. On July 27, 2026, Boraie shared the testing results with the Debtor. Despite Boraie's request, the Debtor has not advised whether it elected to analyze the split samples provided to it during the field work at the Property. *See* Valen Decl., ¶¶ 8-10, Exhibit 7 and Exhibit 8 (containing relevant email correspondence between Mr. Valen and Mr. Bauer).

32. On August 14, 2026, Boraie filed *Boraie Development, LLC and Milltown Ford Avenue Redevelopers LLC's Combined Disclosure Statement and Plan for SB Building Associates Limited Partnership* [ECF No. 310] ("**Boraie's DS/Plan**"). Boraie's DS/Plan notes that "[a]s the Access Order prohibits Boraie and Redeveloper from disclosing the test results, the results are not

included in this Plan but will be provided if the Bankruptcy Court grants relief from the Access Order." Boraie's DS/Plan at 32.

33. Boraie's DS/Plan calls for Boraie's payment of $17,500,000 to the Plan Administrator on the Effective Date in exchange for the Property and related assets (the "**Assets**"), free and clear of liens and encumbrances except as otherwise provided in Boraie's DS/Plan. This structure will enable prompt payment to creditors in the near term.

34. With regard to Property's valuation, Boraie's DS/Plan states:

> As noted earlier, following a six-day trial, the Condemnation Action jury determined the value of the Redevelopment Property would be $26.9 million if the demolition of existing structures were completed, the debris removed, and the environmental contamination fully remediated. The jury determined that the cost of demolition and debris removal would be $1.25 million. And in accordance with the Access Order, Boraie had environmental testing done at the Properties. Taking into account the demolition and debris removal, and the environmental testing and related estimated remediation cost considerations, Boraie is willing to pay $17,500,000.00 for the Assets, which we believe is at least equal to the fair market value of the Property in its current condition. Subject to [Boraie] entering into an Administrative Consent Order with the NJDEP (which contingency the Plan Proponent is willing to pursue quickly and anticipates can be obtained, given appropriate access to the property, by the end of 2026), Boraie is prepared to pay $17,500,000.00 for the Assets, which will enable payment to creditors and fund a settlement to end ongoing litigation.

Boraie's DS/Plan at 32-33**.**

35. Also on August 14, 2026, the Debtor filed its *Plan of Reorganization Proposed by S B Building Associates Limited Partnership* [ECF No. 311] (the "**Debtor's Plan**") and *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Plan of Reorganization Proposed by S B Building Associates Limited Partnership* [ECF No. 312] (the "**Debtor's Disclosure Statement**" and, together with the Debtor's Plan, the "**Debtor's DS/Plan**").

36. In contrast to Boraie's DS/Plan, the DS/Plan is amorphous and highly speculative. Plan payments supposedly will be funded from the Debtor's collection of rents, from the proceeds

of a sale or refinance of real property owned by an unidentified affiliate in North Bergen, New Jersey, or from proceeds from the sale of the Debtor's real property, if such sale occurs prior to the sale or refinance of the North Bergen Property. The Debtor's DS/Plan shrugs off the Property's environmental issues, vastly overstates the Debtor's rental income, and downplays serious property tax issues and Boraie's status as the Property's designated Redeveloper. No contract (or even a letter of intent) for the sale of the Property has been provided by the Debtor, and the Debtor's DS/Plan concedes that the sale/refinancing of the North Bergen property cannot occur (if at all) for at least several years.

## RELIEF REQUESTED

37. Boraie seeks the entry of an Order, pursuant to paragraph 8 of the Access Order, authorizing Boraie to disclose the results of its environmental testing and related estimated remediation costs. The Access Order gives this Court discretion to authorize such disclosure. For the following reasons, the Court should exercise that discretion to allow Boraie to disclose the testing results and related estimated remediation costs, including disclosure to this Court, the creditors, and the NJDEP.

## ARGUMENT

### I. DISCLOSURE OF THE ENVIRONMENTAL TESTING RESULTS IS NECESSARY TO PERMIT THE COURT, CREDITORS, AND OTHER PARTIES IN INTEREST TO EVALUATE BORAIE'S DS/PLAN AND THE DEBTOR'S DS/PLAN

38. To comply with paragraph 8 of the Access Order, Boraie's DS/Plan notes that the environmental testing results are not included but will be provided if the Court grants relief from the Access Order. Boraie's DS/Plan at 32.

39. Relief from paragraph 8 of the Access Order is necessary and appropriate to permit the Court, creditors, regulators, and other parties in interest to evaluate Boraie's DS/Plan as well as the Debtor's DS/Plan.

40. Bankruptcy proceedings are premised upon transparency and informed decision making. In the Chapter 11 plan context, the Bankruptcy Code requires a plan proponent to provide creditors and interest holders with a written disclosure statement containing "adequate information." 11 U.S.C. § 1125(b). "Adequate information" means information of a kind and in sufficient detail, as reasonably practicable, that would enable a hypothetical investor typical of the relevant class to make an informed judgment about the plan. 11 U.S.C. § 1125(a)(1).

41. The Third Circuit has called the filing of a disclosure statement with adequate information a "pivotal concept in reorganization under the Code." *Onieda Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court." *Id.*

42. The Property is by far the Debtor's most significant asset. A sale of the Property is the centerpiece of Boraie's DS/Plan, and, similarly, a potential sale is identified in the DS/Plan as one of the means by which the Debtor speculates that its plan could be implemented.

43. The Property's environmental condition and all related remediation obligations bear directly on the value of the Property, the amount of any environmental liabilities, the feasibility of redevelopment, creditor recoveries, the results of a hypothetical liquidation, and the feasibility of any Chapter 11 plan.

44. Disclosure of the environmental testing results and estimated remediation costs will elucidate the basis for Boraie's proposed payment of $17,500,000 for the Debtor's Assets under Boraie's DS/Plan.

45. Without disclosure of Boraie's test results and related estimated remediation costs, this Court, creditors, and other parties in interest will be left to evaluate plan-related issues without access to information that may materially affect their rights and interests.

46. The Debtor's refusal to consent to disclosure of the test results and estimated costs ***even under seal to this Court alone*** suggests that the Debtor's goal is in fact to impede the Court's ability to fully and fairly evaluate the competing Disclosure Statements and Chapter 11 Plans.

47. Additionally, disclosure to the NJDEP is necessary because, as set forth above and in Boraie's DS/Plan, Boraie's purchase of the Property is conditioned upon Boraie's entry into an ACO with the NJDEP, which in turn is essential to make remediation and development of the Property economically feasible. *See* Boraie's DS/Plan at 32-33.

48. As part of the process to obtain an ACO and move forward with its purchase and remediation of the Property, Boraie will need to share its environmental testing results with the NJDEP and should not be precluded by the Access Order from doing so.

## II. NEW JERSEY'S ENVIRONMENTAL REPORTING AND REMEDIATION REQUIREMENTS MAY INDEPENDENTLY WARRANT DISCLOSURE

49. Under New Jersey law, there is no absolute right to keep the environmental condition of a property confidential. While, in light of the Access Order, Boraie cannot say whether its test results implicate a particular statute or regulation, we note that as a general matter a property owner who is informed of the presence of PCBs or asbestos has a legal duty to report the conditions to the NJDEP.

50. In adopting the Spill Compensation and Control Act (the "**Spill Act**"), the New Jersey legislature found that discharges of petroleum products and other hazardous substances threaten the state's economy and environment and declared a policy requiring prompt containment and removal of such pollutants. N.J.S.A. 58:10-23.11a. The Spill Act also recognizes the public

interest in remediating contaminated former industrial sites so they may be returned to productive use. *Id*.

51. Consistent with those purposes, the New Jersey state legislature imposed an express reporting obligation in N.J.S.A. 58:10-23.11 by which "[a]ny person who may be subject to liability for a discharge" occurring before or after the enactment of the Spill Act "shall immediately notify the department." N.J.A.C. 7:1E-5.3 provides that (with certain exceptions), "any person or persons responsible for a discharge who knows or reasonably should know of the discharge, shall immediately notify the Department…."

52. Neither New Jersey law nor the federal law exempts a Chapter 11 debtor from complying with the Spill Act's notification requirements. The Spill Act and related regulations contain no bankruptcy exception. Moreover, 28 U.S.C. § 959(b) states:

> Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b).

53. The Third Circuit has recognized that "[i]mplicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business even if the continued operation of the business would be thwarted by applying state laws." *In re Quanta Resources Corp.*, 739 F.2d 912, 919 (3d Cir. 1984). *See also In re Kaiser Steel Corp.*, 87 B.R. 662, 665 (Bankr. D. Colo. 1988) (holding that § 959(b) mandates compliance with applicable state environmental law during the post-petition period by a debtor-in-possession which continues to operate a debtor's business).

54. In sum, a property owner does not have an absolute right to conceal information concerning environmental contamination of its property, and such information should not be treated as confidential by a debtor in possession.

## III. DISCLOSURE OF THE ENVIRONMENTAL TESTING RESULTS WILL CAUSE NO UNDUE PREJUDICE TO THE DEBTOR

55. As much as the Debtor wishes to suppress the environmental testing results, their disclosure will cause no undue prejudice to the Debtor.

56. Boraie's testing samples were split with the Debtor when they were taken in late-June/early-July of this year. The Debtor has had three months to perform its own testing of those samples and obtain its own results, and of course the Debtor has had decades in which it could and should have conducted testing and remediated any contamination on the Property. Apparently, the Debtor has chosen not to do so. *See* Valen Decl., ¶¶ 8-10, Exhibit 7 and Exhibit 8. (That is, unless the Debtor has performed testing but has decided not to disclose the results).

57. Once Boraie's testing results and related estimated remediation costs are disclosed, the Debtor will be free to comment on the results or to attempt to challenge them as it sees fit.

58. Moreover, to the extent the test results at issue may reveal contamination, then disclosure to the Court and creditors is essential to evaluate the competing Chapter 11 plans, and disclosure to the NJDEP may be required under New Jersey law. If, however, those results do not reveal any material amount or kind of contamination, then the Debtor will not be harmed by the disclosure. Thus, any perceived prejudice to the Debtor is not the least bit unfair and is vastly outweighed by the need for transparency and disclosure.

## CONCLUSION

59. For the foregoing reasons, Boraie respectfully requests entry of an order authorizing disclosure of the test results obtained pursuant to the Access Order, along with the related estimated remediation costs, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: October 2, 2026
Newark, New Jersey

**FBT GIBBONS LLP**

*/s/ John Mairo*
John S. Mairo

*Attorneys for Boraie Development, LLC and Milltown Ford Avenue Redevelopers*