**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FBT GIBBONS LLP**
Thomas R. Valen, Esq.
John S. Mairo, Esq.
William S. Hatfield, Esq.
Christopher P. Anton, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
Email: tvalen@fbtgibbons.com
jmairo@fbtgibbons.com
whatfield@fbtgibbons.com
canton@fbtgibbons.com

*Attorneys for Boraie Development, LLC and Milltown Ford Avenue Redevelopers*

IN RE:

SB BUILDING ASSOCIATES LIMITED PARTNERSHIP, SUCCESSOR BY MERGER TO SB MILLTOWN INDUSTRIAL REALTY HOLDINGS, LLC, AND ALSOL CORPORATION,

DEBTOR.

(Honorable Vincent F. Papalia)

Chapter 11

Case No. 22-14231 (VFP)

**DECLARATION OF THOMAS R. VALEN IN SUPPORT OF JOINT MOTION OF BORAIE DEVELOPMENT LLC AND MILLTOWN FORD AVENUE REDEVELOPERS, PURSUANT TO PARAGRAPH 8 OF THE JUNE 10, 2026 ACCESS ORDER, AUTHORIZING DISCLOSURE OF ENVIRONMENTAL TEST RESULTS AND RELATED ESTIMATED REMEDIATION COSTS**

**THOMAS R. VALEN**, of full age, under penalty of perjury, hereby declares as follows:

1. I am an attorney-at-law of the State of New Jersey and a Partner with FBT Gibbons, LLP, counsel for Milltown Ford Avenue Redevelopers and Boraie Development LLC (collectively "**Boraie**"). I submit this Declaration in support of their Joint Motion pursuant to paragraph 8 of the June 10, 2026 *Order Granting, in Part, the Joint Motion of Boraie Development*

*LLC and Milltown Ford Avenue Redevelopers, Pursuant to Fed. R. Bankr. P. 2004, 7034 & 9014, D.N.J. LBR 2004-1 and 11 U.S.C. §105(a), for (A) Entry of an Order Authorizing Examination of Debtor's Real Property Regarding Environmental Conditions, or Alternatively (B) Granting Movants' Request for Entry onto, and Environmental Testing of, the Debtor's Real Property and Denying the Debtor's Cross-Motion* [ECF No. 293] (the "**Access Order**"), for the entry of an Order authorizing Boraie to disclose the results of its environmental testing and related estimated remediation costs, filed contemporaneously herewith. Unless stated otherwise, I have personal knowledge of the matters set forth herein.

2. Attached hereto as **Exhibit 1** is a copy of an email exchange between Morris S. Bauer, Esq., counsel for debtor SB Building Associates Limited Partnership, and John S. Mairo of my firm, with emails from September 24, 2026 to September 27, 2026, on which Lawrence S. Berger and I are copied.

3. Attached hereto as **Exhibit 2** is a copy of the transcript of the status conference held before the Honorable Vincent F. Papalia, United States Bankruptcy Judge, in this bankruptcy case on September 23, 2026.

4. Attached hereto as **Exhibit 3** is a copy of the Verified Complaint filed on April 20, 2023, in the Superior Court of New Jersey, Law Division, Middlesex County, in the case titled, *New Jersey Department of Environmental Protection, et,al. v. S.B. Milltown Industrial Holdings, L.L.C.*, Docket No. MID-L-2227-23 (the "**NJDEP Action**").

5. Attached hereto as **Exhibit 4** is a copy of a letter to me from Ann H. Wolf, Assistant Director, Enforcement and Information Support Element of the NJDEP, dated November 7, 2025.

6. Attached hereto as **Exhibit 5** is a copy of an NJDEP publication titled, *Pre-Purchase Administrative Consent Order Guidance*.

7. Attached hereto as **Exhibit 6** is a copy of the transcript of the hearing on cross-motions for summary judgment held before the Honorable Patrick J. Bradshaw, J.S.C., in the NJDEP Action on September 25, 2026.

8. On July 27, 2026, I sent an email to Mr. Bauer forwarding a link to access and download the data tables and associated laboratory reports for the sampling conducted at the Debtor's real property pursuant to the Access Order. A copy of an email chain containing my July 27, 2026 email and Mr. Bauer's reply confirming that he had accessed and downloaded the data and reports and emailed them to Mr. Berger is included in the email chain attached hereto as **Exhibit 7**. Mr. Bauer stated in his reply that he would "circle back" if the email was too large for Mr. Berger to receive. I heard nothing further from Mr. Bauer on that point.

9. On September 21, 2026 I sent an email to Mr. Bauer requesting a copy of the Debtor's test results from the samples that Boraie split with the Debtor pursuant to the Access Order. A copy of an email chain containing my September 21, 2026 email is attached hereto as **Exhibit 8**.

10. I have not received a response to my September 21, 2026 email.

I declare under the penalty of perjury that the foregoing is true and correct.

*/s/ Thomas R. Valen*
Thomas R. Valen, Esq.

Dated: October 2, 2026

# EXHIBIT 1

**Mairo, John S.**

---

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Sunday, September 27, 2026 10:31 AM
**To:** Mairo, John S.
**Cc:** Lawrence Berger; Valen, Thomas R.
**Subject:** RE: SB Building: Motion to Disclose

John:

Sorry for my delayed response. I spoke with Mr. Berger late Friday. He agrees with my email to you that the none of your information can be disclosed to the Judge as part of your motion on the disclosure issue.

Mo

DuaneMorris
www.duanemorris.com

**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

P: +1 973 424 2037
F: +1 973 556 1380
C: +1 973 452 3404

E-MAIL | BIO | VCARD

**From:** Mairo, John S. <jmairo@fbtgibbons.com>
**Sent:** Friday, September 25, 2026 9:39 AM
**To:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Cc:** Lawrence Berger <lberger@uslandresources.com>; Valen, Thomas R. <tvalen@fbtgibbons.com>
**Subject:** RE: SB Building: Motion to Disclose

Mo:

To give you more time to discuss with Mr. Berger since he has a hearing occupying him for part of today, we'll extend the Debtor's time to provide its position on my below email until Noon on Monday, September 28, 2026. If we don't hear further from you or Mr. Berger by that time, we'll assume Mr. Berger has agreed with your position for the Debtor.

Thanks, John

**John S. Mairo**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4428
Mobile +1 973.271.8184

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Thursday, September 24, 2026 8:08 PM
**To:** Mairo, John S. <jmairo@fbtgibbons.com>
**Cc:** Lawrence Berger <lberger@uslandresources.com>; Valen, Thomas R. <tvalen@fbtgibbons.com>
**Subject:** Re: SB Building: Motion to Disclose

John

I see you copied Berger on the email. I don't know his schedule for tomorrow. I do know he has a court hearing tomoorrow and may not be accessible. I also know that he left the office before you sent the email. Your time reference at the end of your email is unreasonable. Not sure of your intentions if we don't respond by that time.

As for your request and without having discussed with Mr. Berger, I don't know why you would have to include any report or discuss any of its contents as part of your motion seeking permission to disclose. I see such inquiry as a prejudicial end run around the reasons for us opposing the disclosure in the first instance. I would suggest to Mr. Berger that he not agree to any form of disclosure prior to the court ruling. The court does not need the report to make a ruling. I will discuss with him when he is available.

Mo

DuaneMorris
www.duanemorris.com

**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

P: +1 973 424 2037
F: +1 973 556 1380
C: +1 973 452 3404

E-MAIL | BIO | VCARD

---

**From:** Mairo, John S. <jmairo@fbtgibbons.com>
**Sent:** Thursday, 24 September 2026 18:26:46
**To:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Cc:** Lawrence Berger <lberger@uslandresources.com>; Valen, Thomas R. <tvalen@fbtgibbons.com>
**Subject:** SB Building: Motion to Disclose

Mo:

The Access Order (ECF 293) on its face arguably prevents us from sharing the test results with Judge Papalia absent consent or leave of court, which may make it difficult to fully present the issues. To solve this, we seek the Debtor's consent to disclose the environmental testing results and related estimated remediation cost report with Judge Papalia and to proceed as follows: file a redacted motion on the docket and an unredacted version under seal with the Court, with a copy of the under seal filing being provided to the Debtor too. The redacted motion would not include the environmental testing results and related estimated remediation cost report, or any specific information regarding the results/report. The unredacted version would include the results/report and specific information about the documents.

Please advise by 5 PM tomorrow (Friday, 9/25). Thanks, John

**John S. Mairo**
Partner

FBT Gibbons

One Gateway Center
Newark, NJ 07102
Direct +1 973.596.4428
Main +1 973.596.4500
Mobile +1 973.271.8184
jmairo@fbtgibbons.com

Add @fbtgibbons.com to your approved senders to ensure delivery.

NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email or by calling FBT Gibbons at (513) 651-6800, so that our address record can be corrected.

For more information about Duane Morris, please visit https://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you

have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: | Case No. 22-14231-VFP |
| SB BUILDING ASSOCIATES LIMITED PARTNERSHIP, | M.L.K. Federal Building<br>50 Walnut Street, 3rd Floor<br>Newark, NJ 07102 |
| Debtor. | September 23, 2026<br>2:46 p.m. |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Boraie Development LLC and Milltown-Ford Avenue Developers: | FBT Gibbons P.C.<br>By: JOHN MAIRO, ESQ.<br>TOM VALEN, ESQ.<br>One Gateway Center<br>Newark, NJ 07102 |
| For the Debtor: | Duane Morris, LLP<br>By: MORRIS S. BAUER, ESQ.<br>200 Campus Drive<br>Suite 300<br>Florham Park, NJ 07932 |
| | Berger & Bornstein, PA<br>By: LAWRENCE S. BERGER, ESQ.<br>237 South Street<br>Morristown, NJ 07960 |
| Audio Operator: | Grace LaBruno |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Sass Entities: | Bracewell LLP<br>By: STUART J. GLICK, ESQ.<br>31 W. 52nd Street<br>Suite 1900<br>New York, NY 10019 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Milltown-Ford Avenue Redevelopment Agency: | Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins<br>By: DENNIS J. DRASCO, ESQ.<br>103 Eisenhower Parkway<br>Suite 401<br>Roseland, NJ 07068 |
| For Borough of Milltown, New Jersey: | Marmero Law, LLC<br>By: ALBERT MARMERO, ESQ.<br>44 Euclid Street<br>Woodbury, NJ 08096 |
| For U.S. Environmental Protection Agency: | U.S. Attorney<br>By: DAVID L. GORDON, ESQ.<br>KRISTA YACOVONE, ESQ.<br>970 Broad Street<br>Suite 700<br>Newark, NJ 07102 |
| For Boraie Development LLC and Milltown-Ford Avenue Developers: | FBT Gibbons P.C.<br>By: WILLIAM HATFIELD, ESQ.<br>One Gateway Center<br>Newark, NJ 07102 |

\- - -

THE COURT: This is the United States Bankruptcy Court for the District of New Jersey. And we are here in the case of SB Building Associates Limited Partnership, 22-14231. And it's a conference that was suggested by counsel for Boraie, and I thought it was a good suggestion. Unfortunately, it took a long time to get scheduled. But, that's the way -- that's the way it goes sometimes.

And then in the interim, I issued the opinion on the fees and expenses. So, I thought we could cover both today and how that's going to proceed going forward. So, why don't we get -- how they're both going to proceed going forward.

And why don't we get appearances, first in the courtroom and then on Zoom?

MR. MAIRO: Good afternoon, Your Honor. John Mairo of FBT Gibbons on behalf of Boraie Development and Milltown-Ford Avenue Redevelopers.

THE COURT: Good afternoon.

MR. VALEN: Tom Valen, also FBT Gibbons, on behalf of the same clients.

THE COURT: Yes. Good afternoon as well.

MR. BAUER: Good afternoon, Your Honor. Mo Bauer, Duane Morris, on behalf of the debtor, SB Building.

MR. BERGER: Lawrence Berger, Berger & Bornstein, also on behalf of the debtor.

THE COURT: Good afternoon.

MR. GLICK: Good afternoon, Your Honor. Stuart Glick, Bracewell, on behalf of the Sass parties.

THE COURT: Good afternoon. And then on the phone? Or on the Zoom?

MR. DRASCO: Good afternoon, Your Honor. Dennis J. Drasco, Javerbaum Wurgaft, and I represent Milltown-Ford Avenue Redevelopment Agency.

THE COURT: Good afternoon.

MR. MARMERO: Your Honor, Al Marmero, Marmero Law, LLC, on behalf of Borough of Milltown.

THE COURT: Good afternoon.

MR. MARMERO: Good afternoon.

MR. GORDON: Good afternoon, Your Honor. David Gordon on behalf of -- I'm with USDOJ. This is the first time I'm appearing before Your Honor in this matter. With me, also on Zoom, is Krista Yacovone, who is EPA counsel.

THE COURT: Okay. Good afternoon and welcome.

MR. GORDON: Thank you.

MS. YACOVONE: Good afternoon.

THE COURT: Good afternoon.

MR. HATFIELD: Good afternoon, Your Honor. William Hatfield from FBT Gibbons, also for Boraie and Milltown Development.

THE COURT: Good afternoon. Oh, you're also with Gibbons?

MR. VALEN: Yes, Judge.

MR. HATFIELD: Yes, Your Honor.

MR. VALEN: He just couldn't make it in person.

THE COURT: No, no. Mr. Watfield (sic), I thought he was with somebody else last time. With Gibbons?

MR. VALEN: No, he's with us.

THE COURT: Oh, okay.

MR. MAIRO: Oh, yeah, Mr. Hatfield.

THE COURT: I'm sorry. I thought he was out of --

MR. VALEN: We try to keep our distance, but he's with us.

(Laughter)

MR. HATFIELD: Sorry I couldn't be there, Your Honor.

THE COURT: No, that's okay. That's no problem. Because maybe I have you down in South Jersey or something. But, whatever. It doesn't really matter.

So, I just wanted to -- I know Mr. Mairo is rising, and if you want to start, it's fine. But, I was just thinking of how to proceed generally. And I do have your letter. I'm not sure whether the parties had an opportunity to speak about some of these issues, which I would hope that you did. But, I don't know where that might have led or not led.

But, the two topics, right, generally are moving towards plan confirmation with two competing plans and, you know, what kind of disclosure statement hearing we're going to

have. And then also the issues regarding the scope and reasonableness of the fees under the abandonment.

And I'm raising them -- first I had them separately in my mind, but then as I was thinking about today, I said, there's got to be a tremendous amount of overlap between what is, you know, the scope and reasonableness of the fees and expenses incurred since 2001 and, you know, what kind of discovery is going to be taken in connection with plan confirmation and otherwise.

And so, I was thinking that they could proceed on the same track, but maybe not, you know, necessarily the end on the same track, but proceed on the same track. Because otherwise it could just go on forever and be duplicative and wasteful, and we don't need any more of that here. We need to get this -- we need to get this done.

And so, in that connection, just in a general, general sense, and I know the first thing Mr. Mairo raised was the adequacy of the disclosure statements. And I'm of two minds of that, to be honest with you. Because the people that really care about this -- and I know everyone cares about it, I'm not saying -- the people that have been involved since the first minute of the first case throughout and who have the biggest stakes are sitting here in front of me and on the Zoom.

And I don't know. I think you guys know enough in terms of what's in the disclosure statements already as to what

you need. I mean, if you want to do more, you can do more. If you think there's certain amendments you can talk about informally and we come back in a week or two and you amend them. But, I'm of a mind to let you send out, you know, disclosure statements, and then today we set the schedule for -- or once that happens, we set a schedule for discovery.

And I know I just said a lot. But, I am trying to streamline this to the extent it can be streamlined. And I am trying to move it along quickly as it can, which, you know, has not been symptomatic of this case in any way, shape, or form.

So, I don't know. What do you think? Do we need a full blown disclosure statement hearing in a month to fight about what's in there? Mr. Mairo, was up first, so I'm going to let him --

MR. BERGER: I appreciate that.

THE COURT: Yes.

MR. MAIRO: And thank you, Your Honor. So, I think we do, you know, need a disclosure statement hearing to flush out if there are any objections and to build that into the disclosure statement. We certainly don't want to slow the process down, but I think we probably do need to set a disclosure statement hearing and objection deadline, so that we can deal with any objections and supplement the disclosure statement if need be.

Something else that we addressed in our letter that

Your Honor has not yet talked about is the disclosure of the environmental testing and the remediation cost related to that. As Your Honor may recall with the order that was entered that allowed Boraie to have testing done, there was a provision in that order that said that testing cannot be disclosed as agreed to by the debtor or by order of the Court.

And as we put in the letter, you know, requesting today's status conference, there is a process that Boraie is trying to undergo with the Department of Environmental Protection --

THE COURT: Right.

MR. MAIRO: -- to obtain an administrative consent order. And that process has started, and it seems like it's potentially moving in a good direction. However, the testing is going to have to get shared with the DEP to really move that forward.

And I also want to add, Your Honor, that after filing, you know, our disclosure statement and plan, not surprisingly, some of the secured creditors kind of asked us about what's happening with the testing and the remediation cost and kind of wanting to see that.

And I know counsel to the EPA, Mr. Gordon, is on the line. And certainly Mr. Glick is here as well. And from the perspective of Boraie, we have no problem with disclosing the testing and disclosing how we came upon what we expect the

remediation cost to be. I think it's appropriate for all creditors, quite frankly, to see that. And we're open to doing that.

But, we want to see kind of what the process would need to be to get that done, whether Your Honor would just order it or whether you'd want to schedule a hearing to have those issues flushed out.

But, that was something else that's important from our standpoint from disclosure and kind of moving this process forward. Because we certainly have the process with the DEP and the administrative consent order, but we've also heard from creditors saying, hey, we want to understand the testing and the remediation cost because it seems to tie in to how you arrived at the number you're putting on the table.

THE COURT: Right. I agree with all of that. And I didn't -- I didn't refer to this directly. I did refer to it indirectly because I said I was hopeful that you may have talked about a couple other things in here ahead of time. And that was one of the things I had in mind for certain. But, I'm not sure --

MR. MAIRO: And I can address that.

THE COURT: -- if that happened.

MR. MAIRO: And I could address that, Your Honor. And it's a mixed bag. I did talk to Mr. Bauer about kind of a process with respect to the disclosure statement and, you know,

scheduling a hearing date. And we talked briefly about maybe the way to do it is if Your Honor would be supportive of it, is to have the clerk's office send out a notice scheduling the hearing, as well as an objection deadline and putting language in it, if any party wants a copy of the disclosure statement from the respective parties, they can contact either Mr. Bauer or the debtors, or our office for the Boraie one.

But, that was kind of the extent of my conversation with Mr. Bauer on that. We didn't really discuss the issues with respect to the environmental testing and the remediation cost.

THE COURT: Okay.

MR. BERGER: I'd like to address that issue first and then I have something else I would like to, along the lines of what you started with. But, dealing with that first, I think the request is outrageous. If Your Honor recalls, they wanted to come on our property to do some work pre-contract. You said you had hardly ever seen that before. I've never seen that before.

But, I think Your Honor's thinking was, well, it just might move things along. And we ultimately agreed, not only to let them on the property to check out the 2016 alleged spill, but then they had problems with the debris on the property, whether there's asbestos.

And we further agreed to that, on one condition. The

condition is, there's no disclosure of any information to anybody, in particular, governmental agency. Because we don't believe they're dealing in good faith. It's their purpose to throw a monkey wrench in the machine and give either prospective purchasers or the DEP all kinds of information which hasn't been vetted by anybody, and may or may not be true.

So, as a condition to what we agreed to, was no disclosure. And if they would like to back off that deal, they're good at backing off deals, as Your Honor's aware, make a motion. And we can address that fully. But, we have no intention whatsoever of allowing them to disclose the information they got as a result of our agreeing to let them go on the property, based upon the condition there'd be no disclosure.

THE COURT: Okay. Okay. Well, I guess, here we are again at a diametrically opposed issue and position. Mr. Glick, I don't know, do you want to speak on this issue?

MR. GLICK: Yes, Your Honor, just very briefly. And I think the other secured creditors feel the same. Basically, Boraie put in a disclosure statement that says, this is how much we think the property is worth, and this is how much we're going to give you.

But they haven't said how they got from A to C. We need to have a B number so we could look at it and evaluate it

and maybe contest it. So, I'm not certain how that disclosure statement could go forward without telling us, you know, how they did their math. That's all we're asking for.

THE COURT: Well, but isn't that a circle? Because they're going to -- they're going to tell you -- the only way they're going to tell you that is by disclosing the information --

MR. GLICK: Correct.

THE COURT: -- that was in the testing.

MR. GLICK: And so I'm not certain how we get past that. But, we can't have a plan confirmed when we can't look at -- we can't understand the numbers. There has to be some disclosure of the numbers.

THE COURT: Well, I guess -- I think I ordered the discovery on the access, and it wasn't really on consent. It was maybe -- it was maybe a tortured kind of reluctant, okay, we can go along with that. But, after I said how I was -- how I was going.

So, this now is crystal clear. You guys crystalized it for me. Perhaps not expedited things, but crystalized it for me. I think we can do a motion, it could be, I guess, 21 days because it's a lot of -- there's a lot there for, you know, for hearing. We'll set the hearing on approval of disclosure statement.

The same time, you do the motions for, you know, to,

I guess, disclose the results, and on what terms. And then they oppose it, and I'll deal with it then in a couple weeks, three weeks. I don't know how else to deal with it.

Because on the one hand, you know, it's not just a circle, it's a Catch-22. Because if, as Mr. Glick says, a disclosure statement can't go forward without knowing how you got from 27-plus million to 17 and a half, then how do you do it without knowing what those -- what those results are? So, it's a Catch-22.

But, there are -- there are ways to deal with it, and I can -- and I can think of ways to deal with it. But, you guys could think of ways to deal with it as well. And I think it's a motion to, I guess, amend that order, right? That wasn't a consent order.

MR. MAIRO: Yes. Your Honor, just to be -- on that point, Your Honor, it was not a consent order. And it's very clear that it's by further order of the Court, the testing --

THE COURT: Yes.

MR. MAIRO: -- could be --

THE COURT: I was trying to get to -- I was trying to get to a point and, you know, it was another place where we're getting stuck. And I tried to get past it. And now we got to deal with it, and I'll deal with it.

MR. VALEN: We're fine doing it by motion, Judge. I do just want to clarify something, and I'm not suggesting that

Mr. Berger meant to not be open about this. But, the samples that we took were split with Mr. Berger, so he has the exact same samples. And we provided him with our test results back in July.

So, to the extent you feel that you need to somehow verify or double check those results, you've had the ability to do so for six weeks.

THE COURT: There's fodder for your motion, I guess.

MR. VALEN: Thank you, Judge.

THE COURT: Right?

MR. GORDON: Your Honor, may I be heard on this on behalf of EPA?

THE COURT: Yes.

MR. GORDON: And just briefly, because I understand you're keying this up for motions. But, in our capacity as a secured creditor, not as a regulator, we think it is essential that we know the value of the remediation. Without it, we don't know -- we don't know the assets of the debtor, and we think the disclosure is insufficient.

THE COURT: Yes. So, you know, we got to deal with it.

MR. BERGER: Let me deal with the second part of it, which may encompass some of what we just talked about. This is going to be a bit of a radical thought, but I think this is kind of a radical case.

I don't see what we're doing with regard to disclosure statements and sending things out to vote. In the end, this all boils down to whether Your Honor finds their plan fair and equitable in terms of its treatment of equity. That's what the case is going to turn on. And to the extent that --

THE COURT: Well, I don't -- I'm not sure I agree with that. Sorry to interrupt you. But, you know, if their plan goes forward, the EPA and Glick and others get paid on the effective date. If your plan goes forward, they get paid who knows when.

MR. BERGER: And I don't disagree with that. But still, I believe Your Honor has to make a determination that their plan, to be confirmable, has to be fair and equitable to equity. Equity's clearly in the money. And you're going to have to make a determination sometime, whether they're fair and equitable. And I think that's -- that's the big issue in this case.

And to get to that point, they need to show what's the fair market value of the property clean, what's the cost of cleaning it up by their view, and then we need to put a number on the $4 million worth of --

THE COURT: So, which way are you arguing now? I'm not trying to be smart.

MR. BERGER: Well, I'm suggesting --

THE COURT: But, I'm saying to you -- so, you just

made their argument.

MR. BERGER: Well, I think I just made my argument, which is that -- that maybe we ought to get onto the issue which is really before us. Because the --

THE COURT: Maybe I should what?

MR. BERGER: The issue before us. Because I think the determination of whether it's fair and equitable, their plan is fair and equitable, the value clean, I think can be done by our presenting an appraisal and they're presenting an appraisal. The cost of cleaning up, it gets trickier. But, basically --

THE COURT: That's an understatement.

MR. BERGER: Yeah. And they're going to have an expert, we're going to have an expert. We have their data. We think we can take their data apart. And it's going to come down to nothing.

Then Your Honor has to put a number on, to the extent that you haven't determined how much the $4 million that we're claiming is actually due us, you're going to have to value that asset. All of which they put on the table for a total of seventeen and a half million dollars, in which equity gets only money, gets money. The unsecureds get money.

If Mr. Glick's client takes the million dollar haircut off his number, because that's the number they used, and if the town of Milltown takes $2 million off their

purported number, and that could be agreed, I don't know. I know that the deal with Mr. Sass has not been agreed. But, if that doesn't happen, there's no money in this deal for equity.

And if we can convince Your Honor that equity has some significant value here, you're going to decide their plan isn't convertible. And then we can get to our plan, which I think is a relatively simple plan.

THE COURT: But --

MR. HATFIELD: Your Honor, this is Bill Hatfield. Can I address an issue?

THE COURT: Well, your co-counsel got up first, so I don't know. But, I'm just -- I'm a little concerned already. I guess I was concerned going in. But, I'm just -- I'm just not understanding why we would separate -- I think you're saying let's just separate the issue of what the equity is in the property. And why?

I mean, that would just -- we don't go into not just the 2020s, we'll be in the 2030s and beyond. I mean, I don't, you know, I don't know why we would split it like that. I'm trying to combine.

MR. BERGER: Well, I think --

THE COURT: I'm not trying to split.

MR. MAIRO: Yeah, I agree with that, Your Honor.

MR. BERGER: Well, I think -- well, I'm trying to accelerate, which I think Your Honor's trying to accelerate.

And if you were to determine that their plan's not confirmable, that would greatly accelerate the process.

THE COURT: I don't -- I don't know -- I'm not going to accelerate the process by first considering theirs and then considering yours. And then if I approve theirs, it's appealed. If I don't approve it, it's appealed. It goes on forever and ever. We just need to get this thing done.

And I want -- frankly, as I've said a thousand times, going through me is not the fastest way to get it done. But, I want to get this done. It's a '22 case, besides everything else, after the '13 case. So, you know, that's -- we're going into other decades. And I'm not going to -- I'm not going to split it up.

MR. BERGER: Okay.

THE COURT: I'm not going to split it up. Is that what you were going to --

MR. MAIRO: Pretty much, Your Honor.

THE COURT: -- you were opposing splitting it up. I'm not going to do it.

MR. MAIRO: Thank you, Your Honor. And I agree with that. And let's get the train on the tracks. Let's set the hearing for disclosure statement and let's set the hearing to have it heard on the disclosure of the test results. Because I think that's how this case will move forward.

And we understand we have to meet the confirmation

requirements to get the plan confirmed. But, that's not for today.

THE COURT: Yes.

MR. MAIRO: Today is to schedule a hearing. We don't need to litigate all the different provisions of the plan now.

THE COURT: Yes. Well, it's way ahead of today. But, to the extent the million dollar payment to Berger to resolve everything is part of the confirmation of the plan, that's, you know, I would put that in the hurdle category. You know what I mean? That's a -- maybe it's an opening salvo. I don't know.

But, you know, to resolve really third party claims all over the place, by a payment enforcing him to accept a payment. I don't know. I just need to get it out there. I saw positive aspects of your plan that people get paid on the effective date. I saw negative aspects of their plan that it's -- I think the payment terms are further drawn out for everyone. For basically everyone. And it's based on what seems to be very, very not firm sales or refinances. You know, that's out there too.

But, I just -- I just want you -- I want this to get moving forward. And I don't know, and I really don't know how that happens without information from both sides as to what the environmental issues are. Because irrespective and independent of what may ultimately happen in this case, wherever you were,

the environmental stuff had to get resolved. Whether it was in the condemnation action that's now abandoned or here. It has to get resolved.

So, you know, I don't -- now I guess this is -- since the condemnation is abandoned, unless a new one was started, I don't know, I heard some rumblings about that. But then -- wasn't there -- oh, no, no. I misspoke. There's a new plan. Is there a new redevelopment plan?

MR. VALEN: There were -- after the condemnation, there were changes to the redevelopment plan --

THE COURT: That's what I'm talking about.

MR. VALEN: -- in order to --

THE COURT: I'm not a condemnation --

MR. VALEN: -- come up with a project that was financially feasible. So, that's -- no one's talking about another condemnation.

THE COURT: And that's what I'm talking about. I misspoke. I'm sorry. I didn't --

MR. VALEN: Putting aside all the procedural aspects of it, right, the condemnation did yield a number that a jury determined was fair value for the property. And we're, as our plan shows, we're trying to work with that.

MR. MAIRO: So, Your Honor, just with respect to the disclosure statement hearing. So, it sounds like we're going to set a date. It sounds like we're going to set a date to tee

up the motion with respect to disclosing the test results and the remediation cost. So, those were, I think, two of the items that we were looking to move forward on.

The third item is what Your Honor mentioned about your fee opinion and trying to figure out, I guess, a path forward with that.

And just one last item that I wanted to put out there that was not in our letter, involves the Borough's secured claim.

THE COURT: Mm-mm.

MR. MAIRO: There's a hearing next Tuesday at 10 o'clock dealing with the Borough's secured claim and objections to it. And, you know, it would seem to be good for the process to try to resolve that. But, it's not something that we necessarily have control over. I did mention that to Mr. Bauer when we spoke, and he said that there still are issues with it.

But, I just wanted to put that on the table too, and I know counsel to the Borough is on the line, that that would probably be something from our perspective that would be good to kind of move forward and try to resolve.

THE COURT: What does that mean? I'm sorry. Are you saying you want me to decide that on Tuesday?

MR. MAIRO: I think it would probably be a good thing. But, I, quite frankly, Judge, don't know where it sits with discovery.

THE COURT: Well, I don't -- what I know is that that's been adjourned for, like, two years. And I haven't looked at it in that whole period. Because you guys have been adjourning it, and I've been accommodating.

And then it's hard to tell me on Wednesday afternoon that I need to decide that thing on Tuesday, when it's been out -- you know, I accommodated everyone. Not you really at all. But, I accommodated everybody else, including the debtor and the Borough in their multiple, multiple adjournment requests. So, I need time to --

MR. MAIRO: Your Honor, I didn't mean that in any way to be critical of the Court or Your Honor with respect to those issues. We just wanted to put it out there that it's something that has been adjourned multiple times. The secured claim of the Borough is something that, you know, we try to address in our plan. I know that the debtor's addressed it in their plan. It seems like the dollar amount though is kind of unclear in light of the objections.

And I'm not saying anything needs to happen Tuesday. But wanted to raise it with Your Honor that it is scheduled for Tuesday, and it would probably be helpful to hear a report from the relevant parties, the debtor and the Borough, where that is and where they see it going.

THE COURT: All right. Well, that's fine. That's totally fine.

MR. BAUER: Your Honor, with respect -- this is Mr. Bauer speaking. With respect to that motion related to the Borough, and there are three other motions that are on Tuesday, Mr. Marmero and I have continually agreed, as Your Honor can see, to adjourn them. They've all been consensual adjournments throughout.

I just -- Mr. Mairo raised it to me for the first time yesterday. I did tell him I need to speak to Mr. Marmero. I don't even think discovery was completed with respect to it. And so I do need to circle back. I'm going to -- and so, yes, I'd be looking to adjourn Tuesday's hearing.

But, I need to speak to him as to how far out. So, maybe we land on the same page. Maybe there are other issues too because -- with respect to the Borough. Not just, you know, purely their assertion that they're owed tax monies. The estate may have counterclaims against them now.

THE COURT: And I -- that's what I was just -- I was just paging to look for that. Because that, it seems to me, if the payment to the Borough is held up pending resolution of those counterclaims -- this is the '20s, then there's the '30s. We may be, you know, well into the '30s, and even to the '40s. I mean, and then no payments start until then?

I don't -- I don't get it. I've read it twice to try to understand if that's what it said. And I thought that's what it said. It said, is pending resolution of the claims

against the Borough.

MR. BAUER: That says -- that's as to their pre-petition claims. But, their post-petition claims going forward, real estate, under the plan, accruing real estate taxes going forward are going to continue to get paid. This relates to the outstanding taxes that are owed to the Borough. The counterclaims --

THE COURT: The Borough's secured claim in this case.

MR. BAUER: Right.

THE COURT: Right. The Borough's secured claim in this case does not get paid until all those counterclaims are resolved, as the way I read this.

MR. BAUER: You read it correctly.

THE COURT: Okay.

MR. BAUER: But, they would be getting --

THE COURT: Mr. Marmero --

MR. BAUER: But, they would be getting paid for --

THE COURT: On a going forward basis.

MR. BAUER: On a going forward basis.

THE COURT: I got it. Mr. Marmero, I mean, do you have anything you want to add to that? I think -- I think that's -- I don't know. It's up to you. Whatever you want to do.

MR. BAUER: But, that's the treatment under the plan.

MR. MARMERO: Yeah.

MR. BAUER: As far as -- as far as their actual claim in coming to -- I mean, in the motion that's pending for Tuesday, I would need to speak to him about adjourning that and rescheduling it.

THE COURT: Yes.

MR. MARMERO: Yeah. With respect to that, Your Honor, I mean, Mr. Bauer is accurate. I mean, we've been, you know, collectively and consensually adjourning the three motions that we're involved in, obviously with the hopes of seeing in some way that the end of the tunnel, which I agree, does keep getting further and further down the line.

With respect to the motion on the secured claim, discovery has been going on. There has been a few depositions that Mr. Bauer has taken. I do believe that --

THE COURT: Was taking or has taken?

MR. BAUER: Has.

MR. MARMERO: Has taken. There's been at least two that we've -- that we've attended. And I believe -- well, I'd have to discuss it with Mr. Bauer. I believe there is some additional discovery that is still needed. So, going into today, our position was going to be to consent to an adjournment so we can, you know, obviously finalize those issues.

THE COURT: Yes. Okay. So, that's all consistent. I understand. But, you know, it's something that needs to get

resolved. I guess -- I guess the provision of the Boraie plan is that they take -- the Borough takes a haircut on the pre-petition secured claim of a million dollars or so, is that --

MR. MAIRO: That's correct, Your Honor. And, I mean, we'll have to think about how we can move the process forward if it just continues to not get resolved. Maybe we escrow the money and we just --

THE COURT: Okay.

MR. MAIRO: -- move forward. I guess we'll just have to think about that.

THE COURT: All right.

MR. BERGER: In the interest of full disclosure, it's our intention to make a motion to disqualify Mr. Boraie's plan and his objections to our plan, based upon the fact that they're not parties in interest.

And that, when you're scheduling whatever we're going to schedule, it's our intention to file that motion. I don't think it necessarily has to come first. Theoretically, it's possible.

THE COURT: Didn't they buy a claim?

MR. BERGER: I'm sorry?

THE COURT: Didn't they just buy a secured claim?

MR. BERGER: They brought some claims previously, and they just recently brought some more claims.

THE COURT: Okay.

MR. BERGER: I don't -- I don't think it's anything --

THE COURT: I don't know. I'm not sure. But, I think that makes them a party in interest. I don't know. If they have a claim.

MR. BERGER: I don't think that buying claims is, per se, good or bad. I think it's the purpose for which they brought the claims, and there's -- there's a lot of cases, most of which I've read. But, we're going to be making a motion on that. And they'll say what they're going to say, and Your Honor will decide that.

In a certain logical sense, should we win that motion, then everything else kind of stops. But, I'm not asking you for that. Let Your Honor decide that motion when he decides it. And if we win it, then we will have spent time doing other things we didn't necessarily have to do. But, so be it.

THE COURT: All right.

MR. BERGER: I just didn't want to --

THE COURT: Yes. I mean, okay. So far, we're at disqualifying propriety, and also determining what the equity is without knowing what the environmental results are.

I'm having trouble -- I'm having trouble, not legally. I'm just having trouble as a -- as a common sense practical matter how this is all -- or why this is all

necessary and why it's all being teed up that way. But, you know what?

MR. HATFIELD: Your Honor, can I address that?

THE COURT: I got to deal with motions, I got to deal with motions, I got to deal with the motions. I'll deal with them all. I don't care.

MR. HATFIELD: Your Honor, can I address that point? Bill Hatfield.

THE COURT: Sure.

MR. HATFIELD: For Boraie. So, Your Honor, you may recall, I argued the access motion to get the sampling done.

THE COURT: Right.

MR. HATFIELD: And at that time, the idea of the partial non-disclosure was to allow the debtor to collect its own samples. So, they collected split samples. And that's the control, right, to see if our data matches their data. We've shared our data with the debtor back in July. And we haven't seen their data. We're not even sure that they analyzed the samples that we provided to them.

So, to move forward on this, as Your Honor points out, common sense is, we weigh the information on the table, right? If they have data and we have data. And that can be evaluated by the Court and by the creditors, right, to see what the issues are at the site, to determine what the value of the property is. And then we can move forward on the plan voting.

THE COURT: But --

MR. HATFIELD: Right? To see which plan makes sense. So, we need to really move forward on the motion to lift the non-disclosure on the data. Because that needs to be provided to everyone, including the Court and the creditors, to get a clear picture of what the value of the property is because the property is impacted.

Whether or not the debtor wants to admit that, the property has been impacted. There are piles of debris with asbestos and other things. That is well known at the site. That's going to require remediation and removal and disposal.

So, those costs need to come forward. We need to be able to provide that information to the creditors and to the Court. And then we can have a hearing on the full information about the property.

This isn't a tricky issue as Mr. Berger tries to say. He's trying to make it tricky. It's pretty straightforward. It's one step after the next. And then we'll get to a plan process.

THE COURT: Yes. I don't think he was meaning tricky in the sense that you just said it. I think he means it's really -- it's going to be complicated. And you can see how it is going to be complicated. But, I'm going to -- I'm going to deal with it.

And just in fairness, Mr. Hatfield, I don't have a

perfect memory, but my memory is not that it was limited -- the bases for the allowing the access was limited to, in some way, letting them do their own testing or anything like that. It was -- they certainly can do their own testing. It sounds like they want to or have to in order to move forward.

But, you know, there was other -- there was other factors involved, on my end, on my end.

MR. HATFIELD: Well, the only way that this becomes tricky is where you hide the information, right? Then it's guess work. We need to have daylight, right, transparency about the information. We move forward. The creditors get to see that. The DOJ and the EPA gets to see that. The other creditors get to see that. The Court gets to evaluate that.

And that goes -- that's all baked into the analysis of the plan, right, the value, the fair market value of the property, what the cleanup is going to cost, and what the current value of the property is without cleanup.

THE COURT: Got it.

MR. HATFIELD: It's not tricky. It's pretty straightforward.

THE COURT: Right.

MR. HATFIELD: One follows the next. Like night follows day. That's the way it works.

THE COURT: All right. I got it. I understand. So, what do we -- what do we take from this? What we take from

this is that, I guess you need me to set a date for the hearing on disclosure statement. And then there's just going to be this motion filed on -- on the disclosure of the testing results.

MR. GLICK: Your Honor, I guess the question I have is that, if we have the disclosure statement hearing on the same date as the disclosure hearing on the test results, that the only result has to be that the disclosure statement that Boraie has filed cannot be approved without that information.

So, it seems that we're having a step that we would have to then file objections for the basis Your Honor already knows and that we can't do the math. So, I don't see how that could be approved.

It would seem that we first have to have, and maybe even on shortened time, I don't think this is a -- I don't think this is a earth shaking issue, like the expense motions were, to just have that first heard on if they could disclose or not disclosure. Or if they disclose, we have to sign confidentiality or put it, you know, in-camera review, have it sealed.

Whatever it is, I think that has to come first. Or else we're just going to waste our time with a disclosure statement hearing.

MR. VALEN: Your Honor, we --

THE COURT: I thought coming out of this disclosure

statement hearing, that's what would be approved, whatever I rule is what would be disclosed. And if I rule that, for example, it has to be disclosed or it has to be disclosed on terms. That's at the same time. If it's -- if it's that it doesn't have to be disclosed, which I'm not prejudging, but not disclosing that information at all, just somehow is not -- it's just not sitting right.

And, you know, when the, you know, maybe there's confidentiality issues. Maybe there's whatever, restrictions on how it gets used. But --

MR. BAUER: When would they --

MR. MAIRO: Your Honor?

MR. BAUER: John, when would you be filing your motion to -- for the -- for the disclosure? When would you --

MR. VALEN: We could file it within a week. I mean, whatever, let's -- let's go forward.

MR. MAIRO: Yeah, we can do it quickly.

MR. BAUER: All right. So, you'll file the motion in a week. So, how much of a window do we need to object to the motion? So, you'd file it, when, by September 30th? And then you're -- when would you -- how much time to object to it?

MR. BERGER: Thirty days?

THE COURT: How many days?

MR. BERGER: Thirty.

MR. MAIRO: Your Honor?

MR. VALEN: Judge.

MR. MAIRO: We don't need -- I don't think 30 days is needed.

THE COURT: How long do you need to put it together? Seven days sounds a little optimistic.

MR. MAIRO: Yeah. I would say October 2nd, so they could just --

MR. VALEN: I don't think it's really a heavy, a heavy lift, Judge, for the reasons --

MR. BAUER: Okay. So, you want to file your motion by October 2nd?

MR. MAIRO: Yep.

THE COURT: Yes. That's your --

MR. VALEN: I'll take on the burden of a shorter schedule, but whatever will get us to the end.

THE COURT: Yes. I mean, it's not a huge difference between September 30th and October 2nd. And I have a little bit of realism in me, and things usually take longer than people think they take.

MR. BAUER: So, how many days after the motion to file an objection?

THE COURT: How about this case?

MR. MAIRO: Do we have a week? I mean, the typical objection deadline is --

MR. BAUER: Is two weeks.

THE COURT: It's two weeks.

MR. MAIRO: Two weeks?

MR. BAUER: Two weeks.

MR. MAIRO: All right.

THE COURT: The typical objection deadline is two weeks. Yes. So, if you file it by the 2nd, you actually get more than two weeks in a way, because then it probably wouldn't be on until -- I guess I could put it on for the 20th or the 27th. But, if it's on for the -- if it's on for the 20th, you would have until the 13th, which is only 11 days.

You know. Mr. Glick, did what I say make sense to you? Why not combine it and rule on what has to be disclosed, and that's what goes out?

MR. GLICK: I'm looking more from really a cost perspective. That every -- every other creditor is going to be filing objections and having to put it together to the disclosure statement because we don't have the number. When we -- I think everybody agrees that we have to get the number. So, it just --

THE COURT: But, that goes -- but, that goes into the -- that would be something that I consider in connection with the motion. Wouldn't it be something I consider in connection with the motion?

MR. GLICK: I'm just trying to say --

THE COURT: The motion to disclose. If the EPA, the

Borough, Sass, everybody says, we need it, then that's something I consider.

MR. GLICK: I see your point, Your Honor.

THE COURT: And that would be an objection to the disclosure statement and a support of the motion, I guess. Right? That's what -- I'm trying to make it --

MR. VALEN: That works for us.

MR. MAIRO: We're open to either way, Your Honor. And certainly, filing our motion by the 2nd, objection by the 16th, the hearing on the 20th, we could do that. Or if Your Honor wanted to combine it, I could see it playing out the way you just described. There would be objection to the disclosure statement and support of our motion.

THE COURT: Yes. I'm going to do the 27th though.

MR. BAUER: The 27th is better for me for a hearing, because I have some logistical issues on the family side, potentially playing out to the 20th.

THE COURT: All right. And then -- the 27th, you know, then --

MR. BAUER: I haven't figured that out.

THE COURT: -- you get from the 2nd to the 20th. You have 18 days. That's more than the two weeks you normally get.

MR. BAUER: So, when's our objection -- if the hearing is the 27th, when's our objection to be filed by?

THE COURT: You know. It's due the 20th

MR. BAUER: The 20th?

THE COURT: Right?

MR. BAUER: Yes. Is that all right?

MR. BERGER: Yep.

MR. MAIRO: And just to be clear, we're only talking about now, a motion to disclose the test results? Or is it the full blown with the disclosure statement as well?

THE COURT: And objections to -- and objections to the disclosure. If I'm going to have the hearing on the disclosure statement, maybe it makes sense to do that a little bit earlier. That those may be due ten days. I don't know. Does that matter? Does that matter if those are due ten days before?

MR. BAUER: Objections to the disclosure statement. What are you thinking? Were you thinking to have them due also the 20th? I mean, we all know that there's going to be some -- from when we each get objections to the disclosure statement, we're going to need to clean up the disclosure statement. So, it goes without saying.

THE COURT: Yes. That's what I'm saying. I agree.

MR. BAUER: I mean, I'd be surprised if the disclosure statements are in a final form to go out on the 27th anyway. You're still going to have to add --

THE COURT: No, no. That's what I'm saying. They're

going to be -- they're going to need to be amended anyway. That's why --

MR. BAUER: Yes.

THE COURT: -- I didn't want to split up the hearings.

MR. BAUER: Are you okay with objections to the disclosure statement on the 20th?

UNIDENTIFIED SPEAKER: Judge, Juan and Christine are going to be out the week before that.

THE COURT: What was that?

UNIDENTIFIED SPEAKER: Juan and Christine are going to be out the week before that. So --

THE COURT: Yes, yes. I'm not -- I'm not doing the 20th. We're on for the 27th.

UNIDENTIFIED SPEAKER: Yeah, I'll get that one.

THE COURT: Yes, yes. Well, wait. I'm out from the -- you know what? I was off by a week. Yes. I'm out -- oh, shoot. You know what? I'm sorry.

UNIDENTIFIED SPEAKER: Chrissy doesn't want it on Thursday maybe.

THE COURT: Yes, yes, yes. I'm going away the week of -- thanks for pointing that out. I have myself going away the 10th to the 17th. But, it's actually the 17th to the 24th.

UNIDENTIFIED SPEAKER: Yeah.

THE COURT: Yes. And therefore, let's make that --

let's just make it the 29th. That gives them plenty of time. I can deal with it. Let's make it the 29th. Let's make it the 29th at 2:30.

And in that case, I think, you know, objections -- I'm just thinking out loud with you guys, the very experienced lawyers. I'm thinking, is it helpful to have the -- to the whole motion practice on the disclosure to have the objections to the disclosure statement come out a little before that? But, it doesn't --

MR. BAUER: It doesn't matter to me. I mean, if the hearing's the 29th, and that would -- seven days before is the objection deadline, which is October 22nd, I don't mind doing the disclosure statement objections and get that to you by the 22nd also. I don't care.

MR. VALEN: I think just a little extra time, the 20th, I think we keep the 20th so we have more time to just flush through things before the 29th.

MR. BAUER: The 20th for both the disclosure statement objection and the objection to the --

MR. VALEN: Yeah.

THE COURT: And then replies? Then everybody gets to reply? And keep the hearing on the 29th?

MR. VALEN: Yeah. Could we do replies maybe by, I don't know, the 27th? Does that make sense?

THE COURT: Yes. I mean, it's not great for me.

But, the 26th is not great for you guys, so I'll do the 27th.

MR. VALEN: For replies?

THE COURT: Yes.

MR. VALEN: Thank you, Your Honor.

THE COURT: I'm trying not to kill everybody's weekend.

MR. GLICK: So, we have, the hearing is on the 29th, replies the 27th, and objections the 20th, is that right?

THE COURT: Yes.

MR. GLICK: Okay.

THE COURT: Objections to the motion and the disclosure statement. That's all assuming that you get it out by the 2nd, because all these dates are based on the 2nd.

MR. VALEN: We'll get that done, Your Honor.

THE COURT: Mr. Valen was ready to file, like, a little while ago.

MR. VALEN: Yeah. And we're talking about the motion to allow for relief from the access order to do the disclosures?

THE COURT: Yes.

MR. VALEN: Correct. Thanks.

THE COURT: And, you know, again, you guys are very experienced, you've been through this a million times. A lot of times the answer to a disclosure statement objection is, let's put aside the environmental thing.

Okay. What about putting it in and saying you disagree with it or whatever? And I would hope that you guys talk about that before. In fact, I'm going to -- I'm going to -- it sounds like there wasn't a lot of talking before this. And I think, you know, maybe that's attributable to the, you know, long and tortured history of this.

But, I think there's a -- there's a legal obligation to talk about it in advance that's required in the rules. And it's also a practical obligation to talk about it in advance. Okay? All right.

MR. BERGER: I'd like to discuss the expense costs Your Honor deduced that, when we started, as to what the procedure's going to be. I haven't been doing so well today. But, I have to make a suggestion on that one as well.

THE COURT: Yes. I have a suggestion, but you make yours. Go ahead.

MR. BERGER: Okay. It seems to me that the -- Mr. Bauer calls these buckets. But, they fall into different, some more difficult than other buckets. For instance, Mr. Bauer's bills related just to the bankruptcy, the second bankruptcy, is about $650,000.

That is something which they have not raised any objections to so far. They've raised a lot of objections. They may come up with some. But, not at the moment. And Your Honor is very familiar with that. You've lived through the

whole second bankruptcy.

So far, as Your Honor's aware, we've received no money from Mr. Boraie in 25 years. The fact that he decided to not deliver the $26 million was his decision. And it's time that we got some money.

So, it seems to me, and I'm not suggesting, and I want to divide that even further by saying, I think Your Honor shouldn't have to look at the number of hours spent or the hourly rates. But, if you could decide the big questions, was the work done in connection with the second bankruptcy as a result of the West Orange case, attributable to them as cost?

And I think I understand there are people who work for the U.S. Trustee's Department who actually will review, you have to pay them, but who review for a number of hours and that kind of stuff keep Your Honor out of the weeds and deal with what I think are the legal issues of whether this is covered or not covered in the bulk. Let somebody else worry about if the hours are reasonable or appropriate.

And that would -- and the easiest one of all would be Mr. Bauer's firm time in connection with the second bankruptcy, because Your Honor is familiar with that. There are fee applications which have been approved. I understand those are just interim.

But, that sounds to me, like, you could deal with a big piece of money in a relatively short time. Others get more

complicated, and Your Honor would be less familiar with some of those other matters. But, this one sounds like one that should be able to be resolved in a very short period of time.

THE COURT: Well, I was thinking somewhat along those lines in the sense that -- and maybe with a little modification, in that, I thought -- there's two overarching thoughts. One was that I did -- and I didn't really call them buckets, but they seemed to be very discreet areas, buckets of, you know, time that is being sought for reimbursement.

And I thought, yes, separate that, make that -- deal with that issue first and what buckets, if that's what we're going to call them, are potential reimbursement areas. And I was just, again, to try to streamline that. And I don't know, and I was going to ask this is, did people need discovery on that? Or is that a -- is that something I could do on the papers?

MR. BERGER: We don't need discovery, Your Honor.

MR. DRASCO: Can I speak to that on the --

MR. VALEN: Yeah, the motion's actually directed against the agency. So, I think it's appropriate for Mr. Drasco to --

THE COURT: Yes, Mr. Drasco.

MR. DRASCO: Yeah. Your Honor, Number 1, the Eminent Domain Act deals with the fees and expenses for abandonment of the eminent domain proceeding. So, if we're going to talk

about buckets and which bucket happens to sit on the top of the pecking order, it's the condemnation action.

And that's the one that, you know, although Your Honor wasn't involved in the meat and potatoes of the condemnation action, Judge Kirsch was, you know, that's -- that's what the issue that should be decided first.

There are serious scope issues with respect to everything else that is sought in those fees, that potentially have been awarded. And it deals with whether or not there's a relationship, a proximate cause issue, with respect to the Mount Laurel litigation and the bankruptcy litigation. So, we are going to be in the need of discovery on all three.

But, with respect to the, you know, the claim that their fees under the Eminent Domain Act that are due because of the fact that Mr. Berger chose to file a second bankruptcy and why he did it and how that's related, you know, I think we are going to need discovery. And I think that that is putting the cart before the horse.

I think we should deal first with the eminent domain fees. And I think Judge Kirsch, who sat through everything from the Daubert hearings through the end of the trial and the post-trial motions, had it right. And that was that, you know, this was something that really should be sent to Judge Harper, who is a special master, since he's the one who lived through all of this, right up until the trial when he retired.

THE COURT: Doug Harper? Judge Harper lived through the trial?

MR. DRASCO: Yes. Well, no, he didn't -- up to the trial. Judge Harper was the magistrate judge on this case. And he, from the filing of the -- from the removal of this case to the federal court, after the filing of the complaint, right up until the pretrial order, the final pretrial order, Judge Harper was the court official who was on this case.

THE COURT: Oh, okay.

MR. DRASCO: Judge Harper retired prior to -- he retired prior to trial.

THE COURT: Okay. I got it. Yes. Well, I guess, I don't -- like I told Mr. -- I guess I said to Mr. -- well, Mr. Berger and Mr. Glick, I didn't want to split things up. And now you're asking me to split things up. And I'm not -- I'm not in favor of that. Sorry.

Because, you know, there's that West Orange case, and it wasn't limited, as I read it, to the condemnation action. It clearly wasn't limited to just the condemnation action. It definitely talked about the pre-condemnation process.

But, you know, my question is whether the parties -- it sounds like, Mr. Drasco, if he says he needs it for the -- for the condemnation action, then he certainly, I guess, would take the position he needs it for the other things.

And I was -- and this kind of bleeds into what I was

saying, which is, if there is discovery needed on that, then, you know, it should be combined. Like, if you're going to oppose Mr. Berger as to why he filed this second bankruptcy, and then you might as well depose him about, you know, the rest of the confirmation issues, I think. I don't know. I don't know. Why not combined them? Why not do it all at once?

But, I was hoping you wouldn't need discovery on it. And I was hoping that you would let me decide it on the papers. That's what I was hoping, to try to streamline things. But, I can't force you to do that. I can -- I can suggest it. And I'm willing to do that.

I'm willing -- the buckets, you're getting into the individual time entries. Just, I'm not ready to bite off that at this point. But, I am ready -- I am ready to bite off what -- so, now I'm telling you where I'm coming out on the scope issue is that I would -- I think that that needs -- why review the fees if, for example, the Mount Laurel action is not reimbursable, why review the fees on that? Why get into discovery on that? Why even -- why deal with that at all? Am I making sense?

MR. DRASCO: Agreed. That makes a lot of sense, Judge. And that's a legal issue, I think, to a large extent.

THE COURT: It's a legal issue, you're saying?

MR. DRASCO: To a large extent.

THE COURT: I think so. That's why I said what I

said. I think this is -- whether it's a direct result, I mean, there was facts in there, there's facts in there. But, you know, direct result sounds like -- it's, like, you used the words proximate cause, Mr. Drasco. And that's what it sounds like.

MR. GLICK: Your Honor, I just wanted to note that we're somewhat in a different boat on our motion than the debtor, because ours are -- first, they're very clearly separated. We had two separate matters. So, we know exactly the fees that were on the condemnation action and what were in the bankruptcy. And we don't have anything beyond the second bankruptcy.

So, we just have -- I think our motion's much more discreet. And I'm ordering it -- I understand we should do things economically. But, the discovery that's going to be had with respect to the Mount Laurel action, that doesn't even apply to us. I think ours is much more discreet.

THE COURT: But, Mr. Glick, just refresh my memory. I don't remember it. Are your fees limited to the second bankruptcy action? Or are they --

MR. GLICK: Yes.

THE COURT: How about as to, didn't you participate in the condemnation?

MR. GLICK: No, no. That. I just meant limited from the perspective, we have condemnation fees for that action and

the second bankruptcy. We have nothing prior. We have no other state court actions. You know, no Mount Laurel actions. All that doesn't apply to us.

We just have -- when the second bankruptcy was filed, when there was going to be the quick take, and then we have the condemnation. And I think it's almost, off the top of my head, three quarters in the condemnation. So, just a quarter of my fees are from the bankruptcy matter. So, you know, the vast majority are in the condemnation. So, I think that's a much more discreet issue.

And if we could -- and I don't think there's any -- there might be objections to hours and such that Your Honor's not going to handle. But, I don't think any party's objecting that under -- under the law, the fees that were actually charged to try the case are not recoverable, because they're not covered by the statute. I don't think anybody's asserting that.

I think those assertions are only for the other litigations and whether the West Orange case applies or not. But, I haven't heard anybody say, no, the fees that were incurred in the trial and the prep for trial of the condemnation action, those are not covered by the statute.

So, I'm just saying, I think that we can, if we're looking at buckets --

MR. DRASCO: Well, the amount -- Mr. Glick, if you

read our opposition to your motion, you'll note that --

MR. GLICK: Which I did.

MR. DRASCO: -- we argued that there was a great deal of duplication. You know, you didn't examine witnesses. Your participation in the trial was very limited. Judge Kirsch did not invite you or Mr. Angor (phonetic) for that matter into chambers, at conferences, before, during, and after the court day.

So, to a large extent, we believe that the fees were duplicative and unnecessary. And I think that goes to reasonableness.

MR. GLICK: Well, if that's an issue, then that's a separate legal issue we could try whether a defendant in a condemnation, who has counsel present, is not allowed to collect their fees because there was another lawyer there who was representing the landowner. That's a legal issue that we could -- we could get into.

I mean, you're saying duplicative effort. That's a whole nother world. I don't think I've seen that argument before saying that other parties to a condemnation, they're not allowed to get paid. They shouldn't have had a counsel there, although they're being sued and their $8 million lien was at issue.

But, that's something we could -- I think that's a legal issue, Mr. Drasco, that we could perhaps brief. I don't

think it's one for discovery.

THE COURT: You're saying he's getting into -- I agree that that's mostly a legal issue. But, he's saying that he's objecting to individual fee items. That's what he's saying. And I don't know what --

MR. DRASCO: And that should come as no surprise.

THE COURT: Is that what you're saying, Mr. Drasco?

MR. DRASCO: Yes. And it should come -- it should come as no surprise to Mr. Glick. It's, you know, it's certainly an issue and it was in our opposition.

THE COURT: But, what about the point that -- okay. You take issue with the reasonableness of the fees. But, what about whether, to the extent they're reasonable, the fees of Mr. Glick are recoverable? That's --

MR. DRASCO: No, I'm not challenging Mr. Glick's hourly rate or the fact that he was -- he was sitting in court, you know, with a pen and a pad --

THE COURT: That's not what I'm saying.

MR. DRASCO: -- in front of him.

THE COURT: That's not what I'm saying. I'm saying that the fees of -- that there's no legal or other issue, or any need for discovery, as to whether Mr. Glick's clients are entitled to reasonable fees for participating in the condemnation action. And I asked -- I'm asking you whether you agree or disagree with that.

MR. DRASCO: No, I don't disagree with that. As a matter of law, under that -- under the statute, you know, parties to the case are entitled to be represented.

I question whether or not it's reasonable and necessary to have duplication of counsel sitting at counsel table throughout the trial, when in fact their paralegal could have been taking notes for what was accomplished by -- by Mr. Glick and --

THE COURT: I don't want to get into --

MR. DRASCO: -- and Mr. Angor.

THE COURT: I don't want to get into that.

MR. GLICK: Well, Your Honor, I think that's -- that is also a legal issue whether under New Jersey law, a paralegal has the standing to sit in court and represent a party.

THE COURT: No, no, it's not a legal issue. I mean, it's not an issue.

MR. GLICK: Correct.

THE COURT: It's a legal issue, but it's not an issue.

MR. GLICK: Right. It's a -- correct.

THE COURT: The paralegal couldn't do it.

MR. GLICK: Obviously. And the --

THE COURT: All right. So, that's it.

MR. GLICK: And even the issue of --

THE COURT: I don't need to discuss that.

MR. GLICK: -- duplication of efforts that because one party has a counsel, the other party should not have a counsel, I think that also is not a legal issue. So, I think a lot of what --

THE COURT: That's what I was trying to get at. And I'm just, I'm wondering what -- in other words, this is the narrow thing, and maybe I'm putting you on the spot. But, I don't -- I'm not really. I'm only putting you on the spot because nobody wants to agree to anything basically.

But, the only point I'm trying to make here is, as there is no issue, legal, that needs factual development as to whether Mr. Glick's client is entitled to the fees that are reasonable in defending the condemnation action.

MR. DRASCO: The way you put that, I agree.

THE COURT: Okay. All right. How do you like that?

MR. DRASCO: Okay.

MR. VALEN: Judge, not to be difficult, but I do want to -- there were arguments made as to whether or not that statute applies in this case.

THE COURT: Yes, you disagree with me.

MR. VALEN: I don't want those arguments to be -- to be waived.

THE COURT: You disagree with me. I get it.

MR. VALEN: Subject to your ruling, however, I have no objection to the statements.

THE COURT: I should have added that. I should have added that. Based on my ruling. That all -- that all is -- that's the introductory clause. Based on my ruling, there's no issue that that's a bucket that -- that Mr. Glick's client's entitled to. Whether what's reasonable in there is not -- is, I guess, up to some debate.

And I'm just not sure what discovery is needed for that. But, you know, I think the number is still not going to get liquidated right away. Right? So, what's the difference? It's coming full circle.

MR. GLICK: Yes, Your Honor.

THE COURT: Okay. All right. So, do you guys need more time to think about that whether -- or it sounds like maybe -- maybe not, whether there's the need for discovery related to the issue of scope? He said no.

MR. BERGER: Yes, we need no discovery, Your Honor.

MR. DRASCO: On behalf of the agency, I submit that there is a need for some targeted discovery with respect to scope and reasonableness.

THE COURT: Okay. Well, it's the agency, is that what you're going to -- is that what you're going to say?

MR. VALEN: We might have contractual obligations to the agency, but their motion is directed to the agency. So, I don't think -- I don't think my voice counts.

THE COURT: All right. So, then maybe we defer this

to the 27th -- the 29th, and just ask, you know, I want to get -- I wanted you to tell me whether you can do limited, targeted discovery as to that issue, or it should be combined with hopefully some kind of disclosure statements. Get approved on the 29th. And then there's going to be a discovery schedule.

MR. BAUER: We don't -- Mr. Drasco keeps saying he needs discovery. I'm curious as to what discovery he needs. I'd love to see.

THE COURT: Well, I want him to tell me.

MR. BAUER: I'd love to -- yeah. So, I'd like to see what his discovery's going to look like, so we can either agree to agree or agree to disagree on certain items.

THE COURT: Yes.

MR. BAUER: Because I don't know what he needs. I mean, again, as Mr. Berger --

MR. DRASCO: Well, the --

MR. BAUER: -- as Mr. Berger says, going back to buckets, my firm's fees, some of the consulting fees, some of the expert fees. I mean, it's kind of spelled out each of the different buckets in our -- in our motion.

THE COURT: Why don't you do this, Mr. Bauer? Put your buckets together, get them over to Mr. Drasco, and his -- well, not co-counsel, whatever, whatever you want to call it, his compatriot counsel.

MR. BAUER: He's got the buckets. They're all

spelled out in the motion itself, each of them.

THE COURT: They're all spelled out in the motion. That's right.

MR. BAUER: Yes. And the fee applications, I think, were attached or they're public information.

MR. BERGER: They're attached.

THE COURT: So, can we have -- can you guys have a discussion as to which ones you may agree are covered? Because I think the condemnation action is covered. And which ones are not. And whether you need discovery to address those.

MR. BAUER: He's got to let me know what discovery he's looking for.

THE COURT: Right. So, that's why I'm saying. So, I want to, like do, like, an informal -- I'm trying to do an informal discovery motion here, in a sense, in that I want to know what discovery may be necessary to address the scope issue.

MR. DRASCO: Fair enough.

THE COURT: And why don't we put that on the same calendar? Put that on the same schedule. Mr. Bauer, can you do a letter putting that all together? Or should I ask Mr. Mairo?

MR. MAIRO: I'm fine doing it, Your Honor.

THE COURT: Mairo's fine with it. So, there you go.

MR. MAIRO: Thank you, Your Honor.

MR. BAUER: So, what you're saying is, Mr. Drasco's got to October 29th to tell us what discovery --

THE COURT: No. No.

MR. BAUER: All right.

THE COURT: No, no, no. That, he's got to do much sooner.

MR. BAUER: Yes.

THE COURT: I would say -- well, in any event, it's the 20th, right? It's the 20th. It's not the 29th. The 29th is a hearing date. Got to do it before the hearing date.

MR. MAIRO: So, we'll add to the schedule of items that by the 20th, Mr. Drasco will let --

THE COURT: Identify which of the areas of -- for which compensation is sought, he needs discovery as to scope.

MR. DRASCO: Fair enough.

MR. MAIRO: Thank you, Your Honor.

MR. BERGER: I take it, Your Honor, EOS is going to tell us why he needs discovery?

THE COURT: Right.

MR. BERGER: And what discovery he's looking for.

THE COURT: Right. What discovery is needed and why, yes. Exactly.

COURTROOM DEPUTY: Judge, this is Juan. I might have missed it, but I just want to confirm the hearing on the 29th.

THE COURT: You're a little garbled, Juan.

COURTROOM DEPUTY: Yeah, I’m a little (indiscernible).

UNIDENTIFIED SPEAKER: It’s 2:30.

COURTROOM DEPUTY: I just wanted to confirm the hearing time for the 29th.

UNIDENTIFIED SPEAKER: The hearing time is 2:30.

THE COURT: I’m not hearing you.

MR. VALEN: The hearing time is for the 29th.

MR. MAIRO: 29th2:30.

UNIDENTIFIED SPEAKER: 2:30.

THE COURT: The 29th at 2:30.

COURTROOM DEPUTY: All right. Thank you.

MR. MAIRO: So, Your Honor, we’ll file the motion by October 2nd. Objections by --

THE COURT: The 20th.

MR. MAIRO: -- October 20th. Replies, October 27th. Hearing, October 29 at 2:30.

THE COURT: Right.

MR. MAIRO: Thank you.

THE COURT: But then you got to add that -- that’s your motion, and then the disclosure statement objections are due on the 20th and replies due on the 27th. And you got to add what Mr. Drasco and I were just talking about.

MR. MAIRO: Yes. For the -- that he’s going to do what he needs to do by the 20th. And to the extent the hear --

and I guess the hearing can include that.

THE COURT: The hearing will include that.

MR. MAIRO: Okay.

THE COURT: Yes. Biting off a lot here, but it needs it.

MR. MAIRO: Thank you, Your Honor.

THE COURT: All right. Anything else?

UNIDENTIFIED SPEAKER: No, Your Honor.

THE COURT: All right. Thank you.

* * * * *

**C E R T I F I C A T I O N**

I, KIM WEBER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Kim Weber

KIM WEBER

J&J COURT TRANSCRIBERS, INC. DATE: October 1, 2026

# EXHIBIT 3

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. BOX 093
Trenton, New Jersey 08625-0093
Attorney for Plaintiffs

By: Willis A. Doerr
Deputy Attorney General
Attorney ID No. 266042018
(609) 376-2789
Willis.Doerr@law.njoag.gov

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; And THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>Plaintiffs,<br><br>v.<br><br>SB MILLTOWN INDUSTRIAL REALTY HOLDINGS, L.L.C.; SB BUILDING GP, LLC; SB BUILDING ASSOCIATES LIMITED PARTNERSHIP; COBRA ENTERPRISES L.L.C.; UNITED STATES LAND RESOURCES L.P.; BERGER & BORNSTEIN, A PROFESSIONAL ASSOCIATION; LAWRENCE S. BERGER; XYZ CORPORATIONS 1-10, and JOHN AND/OR JANE DOES 1-10,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION –<br>MIDDLESEX COUNTY<br><br>DOCKET NO.<br><br><u>Civil Action</u><br><br>**VERIFIED COMPLAINT** |

Plaintiffs the New Jersey Department of Environmental Protection ("DEP"), the Commissioner of the New Jersey Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively, "Department"), by and through their attorneys, file this complaint against Defendants SB Milltown Industrial Realty Holdings, L.L.C. ("SB Milltown"), SB Building Associates, Limited Partnership ("SB Building"); COBRA Enterprises L.L.C. ("COBRA Enterprises"); United States Land Resources, L.P. ("U.S. Land Resources"); SB Building GP, LLC ("SB GP"); Berger & Bornstein, A Professional Association ("Berger & Bornstein"); and Lawrence S. Berger, Esq. ("Berger") (collectively "Defendants"), and allege:

**STATEMENT OF THE CASE**

1. The Department brings this civil action to compel Defendants to remediate contamination resulting from a discharge of hazardous substances at a property located at 2 Ford Avenue in Milltown, New Jersey ("Property"), which has exposed the public and the environment to risk of harm. The Department also seeks reimbursement for costs of remediation incurred at and around the Property. The Property and all offsite areas impacted by the hazardous substances discharged thereon are collectively referred to as the "Contaminated Site."

2. During the demolition of three electrical transformers an unknown amount of transformer oil containing polychlorinated biphenyls ("PCBs") was discharged onto the Property and into nearby waterways.

3. The transformer oil, as a petroleum product, is a hazardous substance and threat to the environment and public health when discharged into the environment and public waterways. The PCBs in the transformer oil are also a hazardous substance and have been linked to a variety of cancers, skin conditions, adverse changes to the liver and thyroid, and neuro-developmental and neurobehavioral changes, posing a threat to public health and the environment.

4. Over the last six years, none of the Defendants have remediated the contamination resulting from the discharge at the Property in accordance with the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, the Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1 to -29, the Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS"), N.J.A.C. 7:26C, or the Technical Requirements for Site Remediation ("Tech Rules"), N.J.A.C. 7:26E.

5. The Property is located across the street from residential and commercial properties, and the public waters into which the transformer oil was discharged abut residential properties and public parks. Because Defendants did not take the

required action to address the discharge, DEP took steps to contain the contamination and partially remediate the Contaminated Site to limit the risks to human health and the environment.

6. The community surrounding the Property has a significant low-income population such that it is considered an "overburdened community" within the meaning of N.J.S.A. 13:1D-158.1.[1] Historically, across New Jersey, such communities have been disproportionally exposed to high-polluting facilities and to the resultant threats of high levels of air, water, soil, and noise pollution, and accompanying increased negative public health impacts.

7. Residents of all communities should receive fair and equitable treatment in matters affecting their environment, community, homes, and health without regard to race, language or income. See, e.g., Exec. Order No. 23 (April 20, 2018), 50 N.J.R. 1241(b) (May 21, 2018); Environmental Justice Law, N.J.S.A. 13:1D-157 to -161.

8. The Department brings this civil action under the Spill Act, the SRRA, the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10a-1 to -73, and the common law to require Defendants to

---

[1] "Overburdened community means any census block group, as determined in accordance with the most recent United States Census, in which: (1) at least 35 percent of the households qualify as low-income households; (2) at least 40 percent of the residents identify as minority or as members of a State recognized tribal community; or (3) at least 40 percent of the households have limited English proficiency." N.J.S.A. 13:1D-158. The Site is located within an area of Milltown that is listed as an overburdened community on the Department's website, pursuant to N.J.S.A. 13:1D-159.

remediate the Contaminated Site, including the discharge of hazardous substances at the Property that spread to public waters; to recover from Defendants the costs that the Department has incurred, and will incur, related to those discharges; and to compel Defendants to pay civil penalties for their failures to comply with applicable law.

**PARTIES**

9. DEP is a principal department in the executive branch of the State. DEP maintains its principal offices at 401 East State Street, Trenton, Mercer County, New Jersey. Pursuant to the authority vested in the DEP by the aforementioned statutes, and through DEP's enabling legislation, N.J.S.A. 13:D-1 to -19, directing DEP to protect human health and the environment, DEP is empowered to compel parties to remediate contamination and to bring proceedings in Superior Court.

10. The Commissioner is the Commissioner of the DEP. N.J.S.A. 58:10-23.11b and N.J.S.A. 58:10A-3. In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred by DEP's enabling legislation, N.J.S.A. 13:1D-1 through -19.

11. The Administrator is the chief executive officer of the New Jersey Spill Compensation Fund ("Spill Fund") and maintains his principal office at 401 East State Street, Trenton, Mercer County, New Jersey. As the chief executive officer of the Spill

Fund, the Administrator is authorized to approve and pay any cleanup and removal costs DEP incurs, N.J.S.A. 58:10-23.11f.c. and d., and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j.d.

12. SB Building is a New Jersey partnership. Its principal business address is 237 South St., P.O. Box 2049, Morristown, New Jersey. SB Building currently owns the Property and is the corporate successor in interest of SB Milltown following a merger with SB Milltown in which SB Building was the surviving corporate entity. The general partners of SB Building are Berger & Bornstein, SB GP, and U.S. Land Resources. SB Building's registered agent is Lawrence Berger.

13. SB Milltown is a New Jersey limited liability company. Its principal business address is 237 South St., P.O. Box 2049, Morristown, New Jersey. SB Milltown owned the Property at the time of the discharge and hired COBRA Enterprises to conduct the demolition on the Property that led to the discharge. Prior to its merger with SB Building, SB Milltown's sole general partner was U.S. Land Resources. SB Milltown's registered agent is Lawrence Berger.

14. COBRA Enterprises is a New Jersey limited liability company. Its principal business address is 31 Cliffwood Drive, Allentown, New Jersey. At the time of the discharge, COBRA Enterprises was owned by Alex Abdalla.

15. U.S. Land Resources is a New Jersey partnership. Its principal business address is 237 South Street Morristown, New Jersey. U.S. Land Resources was the sole general partner of SB Milltown and is a general partner of SB Building. Lawrence Berger is a general partner of U.S. Land Resources.

16. SB GP is a New Jersey partnership. Its principal business address is 237 South Street, Morristown, New Jersey. SB GP is a general partner of SB Building.

17. Berger & Bornstein is a New Jersey corporation. Its principal business address is 237 South Street, P.O. Box 2049, Morristown, New Jersey. Berger & Bornstein is a general partner of SB Building. Lawrence Berger is the President of Berger & Bornstein.

18. Lawrence S. Berger, Esq., is a natural person and a resident of New Jersey. His principal business address is 237 South St. Morristown, New Jersey. Berger is the President of Berger & Bornstein, general partner of U.S. Land Resources, manager of SB GP, and, upon information and belief, is an agent, officer, official, or general partner of SB Milltown and SB Building. Upon information and belief, Berger is the individual in charge of the day-to-day activities of SB Milltown, SB Building, U.S. Land Resources, SB GP, and Berger & Bornstein, and has the authority to correct violations of applicable laws and regulations.

19. "XYZ Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, insurers of, or are otherwise related to the Defendants.

20. "John and/or Jane Does" 1-10, these names being fictitious, are natural individuals whose identities cannot be ascertained as of the filing of this Complaint, certain of whom are partners, officers, directors, and/or responsible corporate officials of, or are otherwise related to, Defendants and/or one or more of the "XYZ Corporation" defendants.

## **FACTUAL ALLEGATIONS**

21. In October 2016, Defendant SB Milltown owned the Property, also known as Block 58.01, Lot 1.02, on the Milltown Borough Tax Map, which contained defunct industrial buildings and was previously the site of a factory owned by the tire manufacturer Michelin.

22. Upon information and belief, prior to October 4, 2016, and during SB Milltown's ownership of the Property, SB Milltown, or a partner, officer, director, agent and/or responsible corporate official thereof, contracted with COBRA Enterprises to perform demolition activities on the Property, which included the demolition of at least three electrical transformers.

23. On October 4, 2016, the Hazardous Materials Unit of the Middlesex County Office of Emergency Management and Preparedness notified the DEP Bureau of Emergency Response that the demolition of electrical transformers at the Property had caused an unknown amount of transformer oil to be spilled into the Lawrence Brook and Mill Pond, which connect to the nearby Farrington Lake.

24. DEP staff arrived at the Property that same day and observed three electrical transformers that were damaged and overturned near a storm drain at the rear of the Property with transformer oil pooling around the base of the transformers.

25. The approximate coordinates that DEP staff found the overturned transformers at was 40°26’56.10’’N, 74°26’19.30’’W.

26. DEP staff spoke with Alex Abdalla, the owner of COBRA Enterprises, and determined that COBRA Enterprises or a partner, officer, director, agent, and/or responsible corporate official thereof caused the transformers to become damaged and overturned in that position, during the course of performing demolition work at the Property.

27. DEP staff observed that the transformers had an inscribed plate stating that each transformer could hold approximately 380 gallons of transformer oil.

28. DEP staff observed that the bulk of the spilled transformer oil had entered a nearby storm drain basin that leads directly to Mill Pond and Lawrence Brook.

29. DEP staff inspected the outfall pipe connected to the storm drain. There was a strong odor of sewage and puddles of amber colored transformer oil in the water, matching the characteristics of the transformer oil observed in and around the overturned transformers.

30. DEP staff further observed a surface spill of transformer oil that extended from the vicinity of the storm drain basin in a northeasterly direction across the paved surfaces terminating in a grassy area within approximately 25 feet of the waters of Mill Pond and Lawrence Brook.

31. DEP staff issued an emergency fishing closure for some of the affected waters.

32. Testing of the transformer oil collected from the Property on behalf of DEP by Cycle Chem, Inc., found that the transformer oil contained PCBs, a hazardous substance under the Spill Act.

33. DEP staff issued field directives to Alex Abdalla and Lawrence Berger, informing them of their responsibility for the discharge and directing them to engage a licensed site remediation professional ("LSRP") to contain the spill and conduct a remediation of the Contaminated Site.

34. On October 4, 2016, Abdalla initially engaged Insurance Restoration Specialists, which began a cleanup of the Contaminated Site. But, on October 6, 2016, Insurance Restoration Specialists

ceased work at the Property because COBRA Enterprises had failed to pay for their services.

35. Neither Abdalla, Berger, any company or association associated with either of them, nor any other responsible party ever engaged a LSRP or took any other required remedial action at any point subsequent to Insurance Restoration Specialists discontinuing work on October 6, 2016.

36. Because no responsible party commenced remediation of the Contaminated Site, DEP authorized the use of Spill Fund monies and other state resources to contain the discharge and remove as much transformer oil as it could in under an emergency action. Not all of the transformer oil was removed, however. On October 6, 2016, DEP retained a contractor, Allstate Power Vac, to continue the cleanup of the Contaminated Site.

37. Allstate Power Vac continued remediation activities at the Contaminated Site under DEP supervision until October 25, 2016.

38. Because Defendants are responsible for the discharge, as dischargers of hazardous substances, persons in any way responsible for the discharge of hazardous substances at the Property, and/or as responsible corporate officers thereof, Defendants are obligated under the Spill Act and the SRRA to complete the remediation of the Contaminated Site and to reimburse DEP for costs it incurred in containing the discharge and partially remediating the Contaminated Site.

39. As a fundamental initial step in the remediation process, Defendants were required to and must now retain a LSRP to conduct all necessary work pursuant to the Spill Act and the SRRA, N.J.S.A. 58:10C-1 to -29. Defendants failed to do so.

40. On July 11, 2022, SB Milltown and SB Building merged. SB Building became the surviving corporate entity and corporate successor to SB Milltown. SB Building remains the current owner of the Property.

41. Two related legal actions were previously initiated in the Borough of Milltown Municipal Court on March 13, 2017, against COBRA Enterprises and a corporation related to the Defendants, Alsol Corp. See State of New Jersey, Department of Environmental Protection v. Alsol Corp. Complaint No. 1212-SF-004765; State of New Jersey, Department of Environmental Protection v. COBRA Enterprises LLC Complaint No. 1212-SF-004764. The municipal complaint issued to COBRA Enterprises was voluntarily withdrawn by DEP, and the complaint issued to Alsol Corp. was dismissed as moot, after DEP determined that it had misidentified the block and lot on which the spill occurred.

**Count I**

**Violation of the Spill Act**

42. The Department repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

43. Petroleum products and PCBs are "hazardous substances" as defined in N.J.S.A. 58:10-23.llb.

44. Any person who discharges a hazardous substance, or is in any way responsible for the discharge of a hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g.c.(1), except as otherwise provided in N.J.S.A. 58:10-23.11g12, which is not applicable here.

45. The costs that the Department has incurred, and will incur, for the remediation of the Contaminated Site are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b., and are recoverable pursuant to N.J.S.A. 58:10-23.11u.b.(2), (4), and (5).

46. Defendants are "persons" within the meaning of N.J.S.A. 58:10-23.11b.

47. SB Milltown, as the owner and operator of the Property at the time hazardous substances were discharged therefrom, and as the party that hired COBRA Enterprises to conduct the demolition on the Property, is a discharger and a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will

incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

48. SB Building, as the corporate successor to SB Milltown, as the surviving corporate entity following a merger with SB Milltown effective July 11, 2022, and as the current owner of the Property, is a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1). SB Building is further responsible for all liability incurred by SB Milltown, including SB Milltown's liability incurred as the owner and operator of the Property at the time hazardous substances were discharged thereon.

49. COBRA Enterprises, as an entity whose actions directly caused a discharge of hazardous substances at the Property, is a discharger and/or a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the

Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

50. U.S. Land Resources, as the sole general partner of SB Milltown and as a general partner of SB Building, and as an entity that controls both SB Milltown and SB Building, is a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

51. SB GP, as a general partner of SB Building, and as an entity that controls SB Building, is a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

52. Berger & Bornstein, as a general partner of SB Building, and as an entity that controls SB Building, is a person in any way responsible for a discharge of hazardous substances, and is

therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

53. Lawrence Berger as President of Berger & Bornstein, general partner of U.S. Land Resources, manager of SB GP, which is in turn the general partner of SB Building, and as an agent, officer, official, or partner of SB Milltown and SB Building, is a person in any way responsible for a discharge of hazardous substances, and is therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

54. "XYZ Corporations" 1-10, are dischargers and/or persons in any way responsible for discharged hazardous substances and are therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will

incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

55. "John and/or Jane Does" 1-10 are dischargers and/or persons in any way responsible for discharged hazardous substances and are therefore liable, jointly and severally, without regard to fault, to remediate the Contaminated Site in accordance with the Spill Act, the SRRA, the ARRCS, and the Tech Rules, as well as for all cleanup and removal costs the Department has incurred, and will incur, related to remediating the Contaminated Site. N.J.S.A. 58:10-23.11g.c.(1).

56. To date, Defendants have not fulfilled their SRRA and Spill Act obligations. Specifically, Defendants have failed to (1) retain an LSRP by November 17, 2016, N.J.A.C. 7:26C-2.3(a)1, 2; (2) comply with the Initial Receptor Evaluation mandatory timeframe of October 4, 2018; (3) comply with Direct Oversight Provision at N.J.A.C. 7:26C-14.2(b) beginning on January 4, 2019; (4) comply with the Remedial Investigation Report mandatory timeframe of October 4, 2021, N.J.A.C. 7:26C-3.3(b); and (5) comply with the Remedial Action Report timeframe of October 3, 2022, N.J.A.C. 7:26C-3.3(b).

57. DEP may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10-23.11u.b.(1); for its unreimbursed investigation, cleanup and removal costs, including the reasonable costs of preparing and successfully litigating this

action, N.J.S.A. 58:10-23.11u.b.(2); for its unreimbursed costs of restoring and replacing any natural resource damaged or destroyed by the discharge, N.J.S.A. 58:10-23.11u.b.(4); and for any other unreimbursed costs DEP incurs under the Spill Act, N.J.S.A. 58:10-23.11u.b.(5).

58. The Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs paid from the Spill Fund pursuant to N.J.S.A. 58:10-23.11q.

59. Pursuant to N.J.S.A. 58:10-23.11u.d, Defendants are subject, upon order of the Court, to a civil penalty of up to $50,000 per day for their failure to remediate the Contaminated Site, as appropriate. Each day the violation continues is a separate and distinct violation. Pursuant to the Penalty Enforcement Law and R. 4:70-2, these penalties may be collected in a summary proceeding. However, while the Spill Act permits an award of penalties upon a summary proceeding, as authorized by R. 4:67-5, the Department requests that the Court conduct a plenary hearing to determine the penalty award in this matter.

**WHEREFORE**, the Department demands judgment in its favor:

a. Ordering Defendants, jointly and severally, without regard to fault, to reimburse DEP and the Administrator for all cleanup and removal costs DEP and the Administrator have incurred related to the Contaminated Site, including the cleanup and removal costs DEP and

the Administrator have incurred related to the Contaminated Site, with applicable interest;

b. Finding Defendants liable, jointly and severally, without regard to fault, for all cleanup and removal costs DEP and the Administrator will incur related to the Contaminated Site, including the cleanup and removal costs DEP and the Administrator will incur related to the Prospect Street Ground Water Contamination Area;

c. Imposing upon Defendants, pursuant to N.J.S.A. 58:10-23.11u.a; N.J.S.A. 58:10-23.11u.d, and Rule 4:70, a civil penalty for Defendants' violation of the Spill Act;

d. In the alternative, ordering that, should the Defendants' penalty liability not be resolved in a summary proceeding, this action shall proceed as a plenary action and defendant shall answer the Department's complaint within 35 days pursuant to Rule 4:67-5;

e. Awarding DEP and the Administrator their costs and fees incurred in this action;

f. Awarding DEP and the Administrator any other relief this Court deems appropriate; and

g. Reserving the right to bring a claim against Defendants in the future for natural resource damages arising from the discharge at the Contaminated Site.

**Count II**

**Violation of the Water Pollution Control Act**

60. The Department repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

61. Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6d. and p., which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C.A. §§ 1251 - 1387. N.J.S.A. 58:10A-6a.

62. Defendants are "persons" within the meaning of N.J.S.A. 58:10A-3.

63. Lawrence Berger is also considered a "person" within the meaning of N.J.S.A. 58:10A-3 as the responsible corporate official of SB Milltown, SB Building, SB GP, U.S. Land Resources, and Berger & Bornstein.

64. The unauthorized discharge of pollutants is a violation

of the WPCA for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6a.

65. DEP has incurred, and will continue to incur, costs from the discharge of pollutants at the Contaminated Site.

66. DEP also has incurred, and will continue to incur, costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, harmed by the discharge of pollutants at the Contaminated Site.

67. The costs and damages DEP has incurred, and will incur, for the Contaminated Site are recoverable within the meaning of N.J.S.A. 58:10A-10c.

68. Defendants discharged pollutants at the Property, which were neither permitted pursuant to N.J.S.A. 58:10A-6a., nor exempted pursuant to N.J.S.A. 58:10A-6d. or N.J.S.A. 58:10A-6p., and are liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that have been, or may be, lost or destroyed as a result of the discharge of pollutants at the Property. N.J.S.A. 58:10A-6a.

69. The Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10c.(1); for the reasonable costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the

costs of preparing and litigating the case, N.J.S.A. 58:10c.(2); any reasonable cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, N.J.S.A. 58:10A-10c.(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants at the Property, N.J.S.A. 58:10A-10c.(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10c.(5).

70. Pursuant to N.J.S.A. 58:10A-10e, Defendants are subject, upon order of the Court, to a civil penalty of up to $50,000 per day for their failure to remediate the Contaminated Site, as appropriate. Each day the violation continues is a separate and distinct violation.

**WHEREFORE**, the Commissioner demands judgment in his favor:

a. Entering a Permanent Injunction against Defendants, without regard to fault, requiring them to remove,

correct, or terminate the adverse effects upon water quality resulting from any unauthorized discharge(s) of pollutants at the Contaminated Site;

b. Entering an order requiring Defendants, without regard to fault, to pay DEP its reasonable costs incurred for any investigation, inspection, or monitoring survey, which led to establishment of the violation, including the costs of preparing and litigating the case;

c. Finding Defendants, without regard to fault, liable for all reasonable costs that will be incurred for any investigation, inspection, or monitoring survey, which led, or will lead, to establishment of the violation, including the costs of preparing and litigating the case;

d. Entering an order requiring Defendants, without regard to fault, to pay DEP all reasonable costs it incurred removing, correcting or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at the Contaminated Site;

e. Assessing civil penalties as provided by N.J.S.A. 58:10A-10e against each of the Defendants for their failure to remediate the Contaminated Site;

f. Awarding the Commissioner his costs and fees in this action;

g. Awarding the Commissioner such other relief as this Court deems appropriate; and

h. Reserving the right to bring a claim against Defendants in the future for natural resource damages arising from the discharge at the Contaminated Site.

**Count III**

**Unjust Enrichment**

71. The Department repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

72. Defendants have failed to perform or fund the remediation of a hazardous discharge at the Contaminated Site.

73. The Department has used and may continue to use public funds to remediate the Contaminated Site.

74. The Department's expenditure of public funds for the remediation of the Contaminated Site, which was and is these Defendants' obligation to fully fund and/or perform, has unjustly enriched Defendants.

75. Defendants have not reimbursed the Department for the funds the Department has spent to conduct the remediation of the Contaminated Site.

**WHEREFORE**, the Department demands judgment in its favor:

a. Finding that Defendants have been unjustly enriched by the Department's expenditure of public funds to partially remediate the Contaminated Site;

b. Ordering Defendants to reimburse the Department for all cleanup and removal costs that the Department has incurred, and will incur, to perform the partial remediation of the Contaminated Site, with applicable interest;

c. Finding Defendants liable for all other compensatory and consequential damages; and

d. Awarding the Department such other relief as the Court deems appropriate.

**Count IV**

**Public Nuisance**

76. The Department repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

77. Public surface waters are a natural resource of the State held in trust by the State for the benefit of the public.

78. The use, enjoyment, and existence of uncontaminated natural resources are rights common to the general public.

79. The surface water contamination from the Property constitutes a physical invasion of public property and an

unreasonable and substantial interference, both actual and potential, with the exercise of the public's common right to this natural resource.

80. The public nuisance continues for as long as the surface water remains contaminated due to Defendants' conduct.

81. Defendants are liable for the creation of a public nuisance in contravention of the public's common right to clean surface water.

**WHEREFORE**, the Department demands judgment in its favor:

a. Ordering Defendants to reimburse the Department for all cleanup and removal costs the Department has incurred, and will incur, to abate the public nuisance created by the discharge of hazardous substances at the Contaminated Site;

b. Awarding the Department its costs and fees in this action;

c. Awarding the Department such other relief as the Court deems appropriate; and

d. Reserving the right to bring a claim against Defendants in the future for natural resource damages arising from the discharge at the Contaminated Site.

**Count V**

**Trespass**

82. The Department repeats and incorporates by reference

each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

83. Public surface waters are a natural resource of the State held in trust by the State for the benefit of the public.

84. The surface water contamination from the Property constitutes a physical invasion of public property held in trust by the State without permission or license.

85. The Defendants are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the surface water resulted from discharges of hazardous substances and pollutants at and from the Property.

86. As long as the surface water remains contaminated, the Defendants' trespass continues.

87. The Department, as trustee of natural resources, including surface water, is authorized to prosecute claims for injuries to natural resources arising from the physical invasion by hazardous substances and pollutants.

**WHEREFORE**, the Department demands judgment in its favor:

a. Ordering Defendants to reimburse the Department for all cleanup and removal costs the Department has incurred, and will incur, related to the discharge of hazardous substances at the Contaminated Site;

b. Awarding the Department its costs and fees in this action;

c. Awarding the Department such other relief as the Court deems appropriate; and

d. Reserving the right to bring a claim against Defendants in the future for natural resource damages arising from the discharge at the Contaminated Site.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: s/ Willis A. Doerr
Willis A. Doerr
Deputy Attorney General

DATED: April 20, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, the Court is advised that Willis A. Doerr, Deputy Attorney General, is hereby designated as trial counsel for Plaintiffs in this action.

## CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES

Undersigned counsel hereby certifies, in accordance with Rule 4:5-1(b)(2), that the matters in controversy in this action are not the subject of any other pending or contemplated action in any court or arbitration proceeding known to Plaintiffs at this time, nor is any non-party known to Plaintiffs at this time who should be joined in this action pursuant to Rule 4:28, or who is subject to joinder pursuant to Rule 4:29-1. If, however, any such non-party later becomes known to Plaintiffs, an amended certification shall be filed and served on all other parties and with this Court in accordance with Rule 4:5-1(b)(2).

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: s/ Willis A. Doerr
Willis A. Doerr
Deputy Attorney General

DATED: April 20, 2023

**CERTIFICATION OF COMPLIANCE WITH RULE 1:38-7(c)**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: s/ Willis A. Doerr
Willis A. Doerr
Deputy Attorney General

DATED: April 20, 2023

**VERIFICATION**

I, Todd Kast, by way of certification, state that:

1. I am an Emergency Response Specialist with the New Jersey Department of Environmental Protection Emergency Response Program in the Bureau of Emergency Response South.

3. I certify that the factual allegations contained in Paragraphs 23-30 and 32-34 of the Verified Complaint are true and correct.

4. I am aware that if the foregoing statements made by me are willfully false, I may be subject to punishment.

*/s/ Todd Kast*
Todd Kast
Emergency Response Specialist
New Jersey Department of Environmental Protection
Bureau of Emergency Response

DATED: April 19, 2023

**VERIFICATION**

I, Nadine Drake, by way of certification, state that:

1. I am an Enforcement Manager with the New Jersey Department of Environmental Protection's Contaminated Site Remediation & Redevelopment Program, Enforcement Information Support Element.

3. I certify that the factual allegations contained in Paragraphs 9-22 and 38-39, and 56 of the Verified Complaint are true and correct.

4. I am aware that if the foregoing statements made by me are willfully false, I may be subject to punishment.

*/s/ Nadine M. Drake*
Nadine Drake
Enforcement Manager
Enforcement and Information Support Element
Contaminated Site & Redevelopment Program

DATED: April 19, 2023

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-002227-23

**Case Caption:** DEP VS SB MILLTOWN INDUSTRI AL REALTY
**Case Initiation Date:** 04/20/2023
**Attorney Name:** WILLIS A DOERR
**Firm Name:** ATTORNEY GENERAL LAW
**Address:** 25 MARKET STREET PO BOX 93
TRENTON NJ 08625
**Phone:** 6093762965
**Name of Party:** PLAINTIFF : DEP
**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
**Document Type:** Complaint
**Jury Demand:** NONE
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO
**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: DEP? NO**

**Are sexual abuse claims alleged by: Commissioner of DEP? NO**

**Are sexual abuse claims alleged by: Administrator of NJ Spill Fund? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

**CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION**

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO **Title 59?** NO **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

| | |
|---|---|
| 04/20/2023 | /s/ WILLIS A DOERR |
| Dated | Signed |

# EXHIBIT 4

State of New Jersey

DEPARTMENT OF ENVIRONMENTAL PROTECTION
Contaminated Site Remediation & Redevelopment
Bureau of Enforcement and Investigations
Mail Code 401-06U
P.O. Box 420
Trenton, New Jersey 08625-0420
Tel: (609)633-1480

PHILIP D. MURPHY
*Governor*

TAHESHA L WAY
*Lt. Governor*

SHAWN M. LATOURETTE
*Commissioner*

Thomas Valen, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

NOV 07 2025

Re: SB Milltown Industrial Realty Holdings Company Site
2 Ford Avene, Borough of Milltown, Middlesex County
PI#: G000003161 (Block 58.01, Lot 1.02)

Dear Mr. Valen:

Per our conversation on November 6, 2025, below is an explanation of compulsory direct oversight and how it applies to the above referenced site. The Department tracks the SB Milltown Industrial Realty Holdings Company as Program Interest Number G000003161 ("Site"). A discharge was discovered on October 4, 2016 (incident number 16-10-04-1042-02), which is the start date or obligation date for remediation timeframes for the Site.

The Site Remediation Reform Act (SRRA, N.J.S.A. 58:10C-1 et seq.) established a statutory timeframe for the completion of the remedial investigation [either May 7, 2014 (N.J.S.A. 58:10C-27) or May 7, 2016 provided certain criteria for an extension were met (N.J.S.A. 58:10C-27.1)] for sites where a discharge had been discovered prior to May 7, 1999. In addition, SRRA authorized the New Jersey Department of Environmental Protection (Department) to establish mandatory and expedited site-specific timeframes for certain aspects of the remediation, including but not limited to the submission of a complete report for each phase of remediation, submission of an initial receptor evaluation, and addressing immediate environmental concern conditions. [see the Administrative Requirements for the Remediation of Contaminated Sites (ARRCS), N.J.A.C. 7:26C-3.3 and 3.4]. These defined timeframes apply to the site, not the person responsible for conducting the remediation, and therefore do not change if there is a change in the person responsible for conducting remediation. SRRA also created the Licensed Site Remediation Professional ("LSRP") Program, which allows LSRPs to be responsible for overseeing the investigation and remediation of sites.

If a statutory, mandatory, or expedited site-specific timeframe is missed, the site is subject to compulsory direct oversight (see ARRCS, N.J.A.C. 7:26C-14.2(a)). The direct oversight requirements are a much more proscriptive process for the person responsible for conducting the remediation. Some of the direct oversight requirements include, but are not limited to, the posting of a remediation trust fund in which only the Department can authorize disbursements, approval

of all submissions, and the Department will direct how the remediation proceeds. A complete list of the direct oversight requirements can be found in ARRCS at N.J.A.C. 7:26C-14.2(b).

ARRCS does include a provision that allows the Department to allow adjustments to certain direct oversight requirements when the Department determines that such adjustments are in the public interest and protective of public health and safety and the environment. The Department typically provides such adjustments via an Administrative Consent Order.

Based on the Site's remediation obligation date of October 4, 2016 (incident number 16-10-04-1042-02), the Site has triggered compulsory direct oversight since the following mandatory timeframes were missed: failure to submit an initial receptor evaluation by the mandatory timeframe of October 4, 2018, failure to submit a remedial investigation report by the mandatory timeframe of October 4, 2021, and failure to submit a remedial action report by the mandatory timeframe of October 3, 2024. Aside from missing mandatory timeframes, an LSRP was required to be retained by November 18, 2016. To date, an LSRP has not been retained.

The Department has not assigned a technical case manager to oversee the remediation of the Site. The site remains non-compliant with remediation obligations and has an assigned enforcement manager with the Department's Bureau of Enforcement & Investigations. The person responsible for conducting the remediation can earn adjustments to certain direct oversight requirements through an Administrative Consent Order. Attached is the Department's "Earning Adjustments to the Direct Oversight Requirements Administrative Requirements for the Remediation of Contaminated Sites (ARRCS) N.J.A.C. 7:26C-14" guidance document, which provides additional information.

Should you have any questions please contact Erica Najar at (609) 940-4748 or email at Erica.Najar@dep.nj.gov.

Sincerely,

Ann H. Wolf

Ann H. Wolf, Assistant Director
Enforcement and Information Support Element

CC: Erica Najar, BEI
William Hatfield, Esq.
Larry Berger, Esq.
Peter Sosinski, DAG

Enclosure: Earning Adjustments to the Direct Oversight Requirements Administrative Requirements for the Remediation of Contaminated Sites (ARRCS) N.J.A.C. 7:26C-14

# EXHIBIT 5

# Pre-Purchase Administrative Consent Order Guidance

Contaminated Site Remediation & Redevelopment Program
New Jersey Department of Environmental Protection

The Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1 et seq., established a statutory timeframe for the completion of the remedial investigation by either May 7, 2014, or May 7, 2016, provided certain criteria for an extension were met for sites where a discharge had been discovered prior to May 7, 1999. See SRRA at N.J.S.A. 58:10C-27 and 27.1. In addition, SRRA authorized the New Jersey Department of Environmental Protection ("Department") to establish mandatory and expedited site-specific timeframes for certain aspects and phases of the remediation, including but not limited to an Initial Receptor Evaluation ("IRE"), Preliminary Assessment ("PA") Report, Site Investigation ("SI") Report, Remedial Investigation Report ("RIR"), Remedial Action Report ("RAR"), Light Non-Aqueous Phase Liquid ("LNAPL") Reporting form, and Immediate Environmental Concern ("IEC") - Response Action form. See the Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS") at N.J.A.C. 7:26C-3.3 and 3.4. Pursuant to ARRCS at N.J.A.C. 7:26C-3.3(c), these defined timeframes apply to the site, not the person responsible for conducting the remediation, and therefore do not change if there is a change in the person responsible for conducting the remediation.

If a statutory, mandatory, or expedited site-specific timeframe is missed, the site is subject to direct oversight by the Department. See SRRA at N.J.S.A. 58:10C-27 and ARRCS at N.J.A.C. 7:26C-14.2(a). The direct oversight requirements are a more prescriptive remediation process for the person responsible for conducting remediation. Some of the direct oversight requirements include, but are not limited to, the posting of a Remediation Funding Source ("RFS"), Department approval of all submissions, and Department direction of how the remediation proceeds. A complete list of the direct oversight requirements can be found in SRRA at N.J.S.A. 58:10C-27.c. and ARRCS at N.J.A.C. 7:26C-14.2(b).

Both SRRA and ARRCS include provisions that allow the Department to adjust certain direct oversight requirements, including when the Department determines that such adjustments are in the public interest and protective of public health and safety and the environment. See SRRA at N.J.S.A. 58:10C-27.g.(3); ARRCS at N.J.A.C. 7:26C-14.4.

The Contaminated Site Remediation and Redevelopment Program ("CSRRP"), Bureau of Enforcement and Investigations ("BEI"), is executing certain Administrative Consent Orders ("Pre-Purchase ACOs") with potential buyers of contaminated sites subject to direct oversight, which allow for adjustments to certain direct oversight requirements, provided the potential buyer meets certain requirements as set forth in SRRA and ARRCS. Once a potential buyer of a site closes on a contaminated property, the potential buyer becomes a person "in any way responsible" for remediating the site pursuant to the Spill Compensation and Control Act ("Spill Act"), N.J.S.A 58:23-11 et seq. Without the benefits of a Pre-Purchase ACO, a potential buyer of a site subject to direct oversight must strictly comply with all the direct oversight requirements set forth in SRRA at N.J.S.A. 58:10C-27.c. and ARRCS at N.J.A.C. 7:26C-14.2(b).

## 1. What is a Pre-Purchase ACO?

A Pre-Purchase ACO is intended to facilitate the remediation of sites that have not been remediated in a timely manner. The Pre-Purchase ACO allows certain adjustments to the direct oversight requirements for parties who are under contract to purchase a site that is subject to direct oversight.

The Pre-Purchase ACO enables a potential buyer who is neither a discharger, a responsible party, nor is in any way related to the responsible party(ies) (see item #5 below) at the site to purchase and remediate the site while maintaining compliance with the requirements of direct oversight. In addition, new compliance timeframes for the potential buyer to complete the remediation are established in the Pre-Purchase ACO.

2. **What is the timing for a potential buyer to enter into a Pre-Purchase ACO?**

A Pre-Purchase ACO must be fully executed by the Department (signed by all parties) **prior** to the potential buyer closing on the property (i.e., prior to becoming a Spill Act responsible party). Please note, the date of a court order transferring ownership of the property to the buyer is considered the closing date and not the date of the actual recording of the deed with the County Clerk's office.

3. **When a potential buyer enters into a Pre-Purchase ACO, what types of adjustments are made to the direct oversight requirements?**

A Pre-Purchase ACO allows the potential buyer to purchase a site that is in direct oversight and have compliance timeframes established for completion of the remediation. The Pre-Purchase ACO also includes the following adjustments:

- Any type of RFS mechanism (except self-guarantee) can be used;
- The one (1) percent RFS annual surcharge fee is waived (does not apply to sites subject to the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 et seq., see item #6 below);
- Proceed with the remediation without prior Department approval;
- Pay annual remediation fees in lieu of the Department's oversight costs;
- Key document submittals continue to go through the Department's Inspection/Review process;
- A Feasibility Study is not required to be submitted; and
- The person responsible for conducting the remediation chooses the remedy.

4. **What direct oversight requirements are not being adjusted?**

- A Licensed Site Remediation Professional ("LSRP") must be retained/maintained to oversee the remediation;
- All known contaminated areas of concern must be addressed, including any contamination which has migrated offsite;
- An RFS must be established for the full cost of remediation; and
- Compliance timeframes will be established for all document submissions that are not in compliance.

5. **What are the eligibility requirements to enter into a Pre-Purchase ACO?**

For a potential buyer to be eligible for a Pre-Purchase ACO, the potential buyer must be able to certify the following three conditions pursuant to N.J.S.A. 58:10C-27.g.(3):

- The potential buyer must not be a discharger of a hazardous substance at the site, a person in any way responsible for a hazardous substance at the site, or a person otherwise liable for cleanup and removal costs at the contaminated site;
- The potential buyer must not presently own, nor have ever before owned the site, nor has the potential buyer ever previously been the operator of the site; and
- The potential buyer must not be a predecessor, successor, subsidiary, partner, shareholder, assign, trustee in bankruptcy, responsible corporate official, or receiver appointed pursuant to a proceeding in law or equity, to any discharger, including any other prior owner of, or any prior tenant at, the site.

6. **How does a potential buyer request a Pre-Purchase ACO?**

If the potential buyer meets all three (3) requirements listed in item #5 above, then the potential buyer should send a letter and a Pre-Purchase ACO Certification form to BEI at the address listed below. In the form, the potential buyer(s) must certify to the three conditions noted in Item #5 above. If there are related entities such as a parent company, holding company, assignment of rights entity, urban renewal entity, etc., each entity must fill out Section C of the Pre-Purchase ACO Certification form to certify that each entity meets these conditions. In addition, the potential buyer should include the following information in the letter:

- Provide a signed contract of sale to confirm the transaction. The entity executing the contract of sale should be the same entity executing the Pre-Purchase ACO, unless there is an assignment of rights;
- Provide a copy of the current deed for the site. Ownership reflected on the deed should match the seller reflected in the signed contract of sale;
- Identify any known outstanding enforcement actions, violations, penalties, liens, and/or judgments with any program area within the Department (NOTE: all enforcement actions, violations, penalties, liens, and/or judgments must be addressed before signing the Pre-Purchase ACO); and
- If the site is not subject to ISRA, confirmation whether an RAO-E is the remediation objective.

Prior to purchasing the site, a potential buyer of a property, whether a known contaminated site or not, should be conducting "all appropriate inquiry" as defined in the Spill Act at N.J.S.A. 58:23-11g.d.(2) (aka, "due diligence") by performing a PA and, if necessary, SI to understand future remediation costs. A completed remediation based on a PA/SI will result in an LSRP issuing an RAO-E.

The potential buyer should send the letter and the Pre-Purchase ACO Certification Form to BEI Chief, Ann Wolf at the address noted below and via email at prepurchase.aco@dep.nj.gov.

Bureau of Enforcement & Investigations
Contaminated Site Remediation & Redevelopment Program
NJ Department of Environmental Protection
401-06U
PO Box 420
Trenton, NJ 08625-0420

Once the letter requesting a Pre-Purchase ACO and the certification form are received, a BEI enforcement manager will be assigned to the site and will help determine the amount of any overdue annual remediation fees and/or oversight fees.

The Pre-Purchase ACO **MUST** be signed by both the potential buyer and the Department **PRIOR** to the potential buyer closing on the property. The Department prefers a minimum two-month lead time to draft and fully execute the Pre-Purchase ACO, however, simple sites may require less time and complex sites may require more time. To ensure the meeting of a closing date, potential buyers should contact the Department as soon as possible and submit all information required by the Department in a timely manner.

7. **Remediation Funding Source Procedures**

- A Remediation Cost Review and RFS-FA Form with the Detailed Remediation Cost Estimate checklist (available at https://www.nj.gov/dep/srp/rfs/) must be certified by the LSRP retained for the Site and submitted via email to the enforcement manager for review and approval. On the form, please check the box labeled "Initial Direct Oversight Remediation Cost Review pursuant to N.J.A.C. 7:26C-14.2(b)4";

- Once the cost estimate is approved by the enforcement manager, the potential buyer will submit the RFS package as a hard copy to the Bureau of Case Assignment and Initial Notice ("BCAIN"). This should include the LSRP certified Remediation Cost Review and RFS-FA form. On the form, please check the box labeled "Initial Remediation Funding Source pursuant to N.J.A.C. 7:26C-5.2(a)", the RFS instrument and the initial one (1) percent annual RFS surcharge fee, if applicable.

**8. <u>Specific Requirements for Industrial Establishments</u>**

- For an Industrial Establishment, as defined at N.J.A.C. 7:26B-1.4, that is subject to ISRA and does not have an Entire Site No Further Action ("NFA-E") or Entire Site Response Action Outcome ("RAO-E"), all remaining remediation required at the site shall be based on a complete PA/SI;
- Prior to closing, all applicable General Information Notices ("GIN") will be submitted to the Department;
- When an ISRA Remediation Certification form is required, then prior to closing, the potential buyer will submit an ISRA Remediation Certification form (available at https://www.nj.gov/dep/srp/srra/forms/) and sign sections F and G on that form;
- Prior to closing and concurrently with the submittal of the ISRA Remediation Certification form, the potential buyer and its LSRP retained for the Site will submit the LSRP certified Remediation Cost Review and RFS-FA form;
- Concurrently with the submittal of the ISRA Remediation Certification form, the potential buyer will establish and maintain an RFS;
- Concurrently with the submittal of the ISRA Remediation Certification form, and annually thereafter, the potential buyer will submit the one (1) percent annual RFS surcharge fee; and
- Concurrently with the submittal of the ISRA Remediation Certification form, the potential buyer will submit the Site and Contact Information Update form (available at https://www.nj.gov/dep/srp/srra/forms/).

**9. <u>What are the consequences if a person signing a Pre-Purchase ACO does not comply?</u>**

- While the Department encourages that a potential buyer of a contaminated site purchase the site only after conducting all appropriate inquiry (see Spill Act at N.J.S.A. 58:10-23.11g.d.(2)), and after fully understanding the financial commitment of completing the remediation of the site in question, the Pre-Purchase ACO includes terms that if the party signing the Pre-Purchase ACO does not comply, the requirements of full direct oversight (see ARRCS at N.J.A.C. 7:26C-14.2) will be reinstated.
- Any owner of a contaminated site, unless exempted from liability under the Spill Act, that does not comply with State statutes and Department regulations is subject to penalties. Penalty amounts are referenced in ARRCS at N.J.A.C. 7:26C-9.5.
- Pre-Purchase ACOs do not include stipulated penalties because the Department encourages parties to buy, remediate, and redevelop sites where cleanups have languished. However, non-compliance with the Pre-Purchase ACO may still include penalties of up to $25,000 per day, depending on the violation(s).
- The Department, after appropriate notice of non-compliance, may draw down on the RFS and use that money to conduct remediation at the site pursuant to N.J.A.C. 7:26C-5.13.

For more information on Pre-Purchase ACOs, please contact BEI at (609) 633-1480 and ask to speak with the Duty Officer.

To conduct an Open Public Records Act ("OPRA") review of the Department's files for the site of interest, please refer to the directions at the following link:

https://www.nj.gov/dep/opra/opraform.html

The Department recommends that a potential buyer of a potentially contaminated site seek legal advice prior to purchasing the property. The Department does not provide legal services.

# EXHIBIT 6

SUPERIOR COURT OF NEW JERSEY
MIDDLESEX COUNTY
LAW DIVISION - CIVIL PART
DOCKET NO.: MID-L-2227-23

x- - - - - - - - - - - - - - x

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND

Plaintiffs

-vs-

SB MILLTOWN INDUSTRIAL REALTY HOLDINGS, LLC; SB BUILDING GP, LLC; SB BUILDING ASSOCIATES LIMITED PARTNERSHIP; COBRA ENTERPRISES LLC; UNITED STATES LAND RESOURCES, L.P. BERGER & BORNSTEIN, a professional association; LAWRENCE S. BERGER, XYZ CORPORATIONS 1-10, and JOHN AND/OR JANE DOES 1-10,

Defendants

x- - - - - - - - - - - - - - x

TRANSCRIPT

OF

MOTION

Held at: Middlesex County Courthouse
1 JFK Square
New Brunswick, NJ 08903

Heard on: September 25, 2026

B E F O R E:

THE HONORABLE PATRICK J. BRADSHAW, J.S.C.

Audio Operator: Gina M. Janusz

**TRANSCRIPT ORDERED BY:**

THOMAS VALEN, ESQ.
(FBT Gibbons LLP)

**A P P E A R A N C E S:**

PETER SOSINSKI, ESQ.
(Deputy Attorney General)
Attorney for the Plaintiffs

LAWRENCE S. BERGER, ESQ.
(Berger & Bornstein LLC)
Attorney for the Defendants

I N D E X


| ORAL ARGUMENT | PAGE |
|---|---|
| BY MR. SOSINSKI | 9/21/36 |
| BY MR. BERGER | 17/28 |
| DECISION | 38 |

THE COURT: All right. This is NJ Department of Environmental Protection versus SB Milltown Industrial Realty Holding, LLC, et al. There's a lot of new defendants here, also including Lawrence S. Berger. Middlesex docket on this is 2227-23. It's 10:01 on the 25th of September. This is Judge Bradshaw working out of Courtroom 402, Middlesex County Superior Court. I am live here in court today, as are my participants. Let's go ahead and get the appearances starting with the plaintiff, please.

MR. SOSINSKI: Good morning, Your Honor, Deputy Attorney General, Peter Sosinski on behalf of plaintiffs, Department of Environmental Protection, et al.

MR. BERGER: Good morning, Your Honor, Lawrence Berger, Berger & Bornstein on behalf of defendants.

THE COURT: Okay. So on the Court's docket this morning is a motion for summary judgment filed by the DEP with a cross motion filed by the defendant seeking their own summary judgment. Court has had the ability to read everything that was submitted, is familiar with this case so I set it down today after some long gap to hear these motions.

You should know that the Court is well aware



of the facts of the case. Both of you submitted statements of undisputed material fact, but then you both dispute some of the facts. Unless I'm wrong, it's just a counter statement of the material facts. I don't know that you went through it paragraph by paragraph.

But anyway, in short summation, and you guys are welcome to amplify this or supplement it. We have an October 4th, 2016 incident that takes place on the defendant property. A hazardous material unit of the Middlesex County Emergency Management notified the DEP, Bureau of Emergency Response, that the demolition of electrical transformers on the property had caused an unknown amount of transformer oil to be spilled into the Lawrence Brook and Mill Pond.

The DEP staff arrived at the property that same day, observed three electrical transformers that were damaged and overturned near a storm drain at the rear of the property, with transformer oil pooling around the base of the transformers. During the time of that, SB Milltown Industrial Realty Holdings LLC was the owner of the site. July 11th, of 2022, SB Building Associates Limited Partnership became the surviving corporate entity and the corporate successor to SB Milltown Industrial Realty Holdings.

DEP staff observed the spilled transformer oil had entered the nearby storm drain that leads directly to the pond. October 4th, 2016, Alex Abdalla, owner of defendant, Cobra Enterprises, initially engaged Insurance Restoration Specialists, which began a cleanup of the contaminated site. However, on October 6th, of 2016, Insurance Restoration Specialists ceased work at the property because Cobra Enterprises didn't pay them.

Prior to ceasing the work, the IRS, again, Insurance Restoration Specialists, tested the transformer oil collected from the transformers, which found to contain 26.5 PPM of PCBs. DEP argues that because no responsible party commenced remediation of the contaminated site, DEP authorized the use of spill fund monies and other state resources to contain the discharge and remove all the transformer oil as it could.

DEP retained contractor, Allstate Power Vac to continue the cleanup of the contaminated site. Allstate Power Vac continued remediation at the contaminated site under DEP supervision until October 25, of 2016. APV brought a vacuum truck on the property to vacuum out liquids from each of the 55 gallon drums that were staged on the site by IRS.



APV conducted a composite liquid sample consisting of homogenized liquid from all 55 gallons and the vacuum truck, which returned a result of 9.5 PPM of Aroclor, A R O C L O R 1260. DEP staff issued field directives to Alex Abdalla and Lawrence Berger, informing them of their responsibility for the discharge and directing them to engage a licensed site remediation professional.

Some defendant's facts. Defendant indicates on October 4, 2016, defendant, SB Milltown owned the property on which this incident occurred. Subject property is a former industrial complex, which in 2016 was in the process of having its vacant buildings demolished. Subject property is part of a larger industrial complex consisting of two other adjacent properties owned by the defendant, SB Building and Alsol, which are entities which have an affiliated with SB Milltown, as well as the defendant, United States Command Resources.

In 2016, defendant, SB building and SB Milltown contracted with defendant, Cobra Enterprises LLC to demolish certain buildings and other structures improvements on their respective properties. Demolition contract does not state or otherwise provide the transformers are part of the demolition work to be

performed by Cobra. Cobra is an unrelated third party with respect to the defendant, SB Building and SB Milltown, Berger and USLR. There were no samples taken and tested exclusively of the fluid discharged into waters or the lands of the State of New Jersey, which showed that the fluid discharge contained PCPs or other hazardous substance. That's defendants' position.

There was no sample taken and tested, which was limited exclusively to the borders and the drainage facility. The only test which plaintiff has produced in support of its motion would show PCPs are from samples taken from numerous sources, including 55 gallon drums, which were brought to the site by third parties, the drums that is, I guess, along with contents of a vacuum truck, for which no certification of its uncontaminated condition prior to cleanup activities were performed on the subject property.

Contents of the three transformers, which would have included any of the transformers which were intact and did not leak fluid, only one of the transformers leaked. There's no evidence which of the three transformers on the subject property leaked.

I don't think, though, there's a dispute that there was contamination on the site. I don't think defendant disputes that. At any rate, there are more



facts, I guess. Those are the relevant ones to your application for summary judgment, of which defendants are entitled to summary judgment on their Spill Act count 1, and on the WPCA count claims because each defendant is a person in any way responsible for the discharge of hazardous substance on the site.

Point two, plaintiffs are entitled to summary judgment relief on their unjust enrichment claim, count 3 because the defendants have been unjustly enriched by failing to perform the remedies of the contaminated site. Again, there is a cross motion and an opposition filed. But I'll turn it over to the DEP to tell me support your application.

MR. SOSINSKI: Thank you, Your Honor. And I believe that you reiterated most of the facts pretty eloquently. And I would just like to focus on a few aspects of this, specifically our counts and the statute of the Spill Act specifically. As you indicated, there isn't much of a fight with regards to, there was a spill on the property. There are photographs of the transformer that was flipped over, and there is leaking. Obviously, the photograph shows that.

We have certifications from DEP, employee certifications from members of Allstate Power Vac.

With that being said, under NJSA 58:10-23.11u, whenever the Department determines that a person has violated provisions of the Spill Act, any rules, regulations or directives, they are able to bring an action for civil penalties.

As you had noted, SB Milltown owned the property at the time, and they recently merged with SB Building. Therefore, under Ventron, (phonetic @ 10:12:30) for example, an individual who merges into another property has, still responsible for all the contamination, and as SB Milltown was the owner at the time of the spill, there isn't really much of a fight with that either. I think defendant's summary judgment also indicates that.

Pursuant to the Spill Act, honestly, any owner is in, any person in any way responsible, pursuant to the Spill Act, obviously. This isn't an instance, Your Honor, where a hypothetical where you're just an owner of a property, just someone comes in and spills PCB on it, and DEP is attempting to go after you. This is an instance where there is a demolition contract, there is an agreement between two parties, and as SB Milltown was the owner at the time, they would still be responsible for it.

That's just how the Spill Act works. And



obviously, the legislation indicated that the Spill Act can be liberally construed in its texts and any purposes. So it's our position that, obviously SB Milltown, as the owner, which was then merged into SB Building, would be responsible for the contamination on the property.

We have also obviously named Cobra. Unfortunately, they defaulted in this process, and, therefore, you know, there is a contract between the two parties. Obviously, SB Building could indemnify Cobra after any sort of claims against SB Building. And with that being said, I think Count 1 and Count 2, we believe that summary judgment should be granted. And then with Count 3, with the unjust enrichment because there was contamination on the property because they're the owner and, therefore, liable under the Spill Act, they have been unjustly enriched for not remediating the property.

DEP was simply asking the owner to get an LSRP, do some tests to see if the contamination was there. What they had to deal with was a third party at least containing the contamination as quickly as possible. Therefore, all they had to do was contain that, collect as much as they can, and, therefore, obviously, APB, as you could see, was able to collect

as much as they could from the gallons that was collected from the property. Therefore, they could only work with whatever they can.

With that being said, it was tested. There was contamination on the property. SB Milltown was the owner at the time. They merged into SB Building. And, therefore, we believe, for at least both points, Your Honor, the Department of Environmental Protection had spent tens of thousands of dollars in order to remediate something that happened that was the cause of the demolition that was contracted. So, therefore, we believe our summary judgment should be granted.

THE COURT: What say you about the defense's position about the testing and you --

MR. BERGER: Your Honor, I'm having a little trouble hearing you. It's probably my age.

THE COURT: That's okay.

MR. BERGER: More than anything.

THE COURT: I'm asking counsel what his position is with regards to your defense assertion that you don't have the proofs. You don't have an expert, correct?

MR. SOSINSKI: Correct, Your Honor.

THE COURT: Don't you see that as a problem?

MR. SOSINSKI: No, I don't believe so, Your



Honor. I'm not sure what an expert would really be able to opine on. If we were to acquire an expert, they would have to view the same documents that we all have viewed and this being a decade long event. This was in 2016. An expert would view this, see there, say, Aroclor 1260 is a PCB. It's a contaminant. It goes above any sort of, you know, any --

THE COURT: Yes, but you don't like, wouldn't the expert tell me where it came from? Did it come from the transformer that leaked? What are your proofs?

MR. SOSINSKI: No, not necessarily, Your Honor, because as you see that all of, you know, we have DEP employees who indicated the contamination from the actual transformer and they also, these DEP employees were indicating, they are aware that PCB has been used in electrical transformers in order to be used as a fire or flame retardant in a way.

So, realistically, there's contamination on the property. A contamination occurred. There are photographs. There's certifications. There's eyewitnesses. Needless to say, I think an expert would only view the same things that the Court is viewing right now and DEP employees are viewing right now who are also in themselves able to opine on contaminations

as, you know the Department of Environmental Protection --

THE COURT: You can't, have you listed a DEP employee as an expert?

MR. SOSINSKI: No. No, Your Honor.

THE COURT: Right, so they're going to be able to testify about facts. They're not going to be able to give the Court any opinion.

MR. SOSINSKI: And their past history with working with contaminants, correct, Your Honor.

THE COURT: So, I don't know if I'm saying this right, but NJDEP versus Dimant, D I M A N T?

MR. SOSINSKI: Dimant, Your Honor.

THE COURT: Dimant, 212 New Jersey 153, 2012. In that case, the Supreme Court ruled that the DEP failed to show with persuasive expert proof how a pipe from the defendant's property observed dripping a contaminant on a single day could have reasonably made its way into the underground water during the defendant's business operations. Interpreting the terms of the Spill Act, the Court elaborated in Dimant upon the statute's requirement of proof of causation.

Specifically, a defendant, quote, "must show, must be shown to have committed a discharge that was connected to the specifically charged environmental



damage in some real, not hypothetical way. A reasonable nexus or connection must be demonstrated by the preponderance of the evidence. It is not enough for the plaintiff to simply prove that a defendant produces a hazardous substance and that the substance was found on the contaminated site and ask the trier of fact to supply the link.

Applying this causation standard, the Court there concluded the DEP's expert, they had an expert, and factual proofs fell short by failing to connect the discharge from the pipe during the defendant's operation to the soil or ground damage at the heart of the contamination case. Sufficient proof of causation is likewise an essential element of plaintiff's common law claims. Approximate causation of harm is a classic ingredient of a cause of action for negligence." That's the Townsend versus Pierre case, 221 New Jersey 36.

So you want the trier of fact, which this would be a bench trial, which would be me, to say that the samples that you took from 55 gallons of mixed up stuff, and the sample that you took from a vacuum truck, which clearly had been used before, right, it's a vacuum truck, that showed PCPs comes from the one transformer that fell here. How can you possibly make

that link? How do you get over the, you mixed it up, you homogenized the samples and you tested it, and it had PCPs, how does that get to, that came from the one transformer that fell?

MR. SOSINSKI: Well, as you can see, Your Honor, from, --

THE COURT: Like, how do you know it didn't come from the other two transformers that didn't open up? How do you know the PCPs weren't in there?

MR. SOSINSKI: Regardless, it would still be a contamination on the property, correct, Your Honor?

THE COURT: They didn't spill those other two.

MR. SOSINSKI: No, Your Honor, but there was a spill of a contamination, and therefore, as we had indicated in two of our exhibits, the first one was IRS' testing of the transformer, which was 26.5 --

THE COURT: It wasn't just the transformer.

MR. SOSINSKI: It was. It was in the transformer. There was the email indicated from IRS in the transformer. The next one was APB, which did the homogenized 55 gallons. Therefore, it was 9.5, assuming after all of that contamination was collected, it must have been diluted. I think that is obviously what the DEP employees had indicated. If you collect



all of this, and it's still going to have contamination, which is over the limit that DEP allows.

THE COURT: I don't think you're understanding my point of proofs. At any rate, I'll turn it over to counsel for your arguments.

MR. BERGER: I think you're doing it very well for me, Your Honor, I don’t know if I --

THE COURT: You admit there's contamination on the property, right?

MR. BERGER: No.

THE COURT: I think you did in your brief.

MR. BERGER: Okay, well, let me be clear on that because Your Honor recited the facts to say that. But Your Honor seems to understand that there was PCBs in transformers on the property. I would call that’s contamination. But there’s under the Spill Act, it's only if there's actually a spill.

So we could have all the transformers you wanted, the PCBs and hazardous oil. That's not a violation of the Spill Act. Until there's a spill of this, I'll call it contamination, because I think that was your word. It's not actionable under the Spill Act. So the fact that I had transformers on the property that had PCBs is not a violation of the Spill Act. It's if the material then spills onto the ground

or it’s water that's what the Spill Act is about, and Your Honor seems to understand that. So the fact that there was contamination within the transformers but contained in the transformers is not a violation of the Spill Act. I don’t know --

THE COURT: Is counsel incorrect that the IRS, that company, tested the specific one that spilled?

MR. BERGER: No. They were very confused as to what they, was tested. They didn't know which transformer was tested, or in fact, all the fluid left in the carcasses of all three transformers were mixed into a drum, and a test was made from that. So IRS, the testimony was not clear as to where the tests were made, and they left two possibilities. One was --

THE COURT: Did you guys depose anybody?

MR. BERGER: I deposed two people.

THE COURT: Okay.

MR. BERGER: Can I explain, Your Honor?

THE COURT: Well, do you have a transcript? Because I mean, I didn't see, --

MR. BERGER: I sure do.

THE COURT: -- was that an exhibit?

MR. BERGER: Okay, I think we provided excerpts of the transcripts.



THE COURT: Okay.

MR. BERGER: Which, you want me to address the IRS testing specifically?

THE COURT: Yes, because that's the one counsel is indicating to me was specific to this.

MR. BERGER: Let me see if I can put my hand on it. Can I ask, would Your Honor like to see the actual transcript itself, or I could read it to you?

THE COURT: You can read it to me.

MR. BERGER: Okay. This is on page 18 of the deposition of Anthony Carl. He was one of the two people I deposed. And I asked the question, in line 23, do you know where the sample was taken? Answer, I don't recall. They took it out of one of the transformers, or one of the drums that they transferred material into. But no, I don't, means, I don’t know where they took it from. So the two, and both witnesses testified to the same thing, that IRS went and made a test. They're not sure what the test was. Could have been in one of the transformers. It could have been in a 55 gallon drum where they put the remaining material in the three transformers, and they found some PCBs.

To the extent, and I think Your Honor seems to understand that, to the extent that the PCBs were

found in transformers that didn't leak, that’s not a Spill Act violation. And because they mixed it all up, they didn't know it. If they had made a test on the transformer that leaked, we would know something. You would know it has got PCBs that, the one that leaked had PCBs in it, or it didn't. But nobody did that.

And in fact, the people from the DEP they’re not even sure where the test was made or how it was made. They obviously didn't witness the test.

THE COURT: All right. So to that point, I'll turn back to counsel. Now, if that's the testimony, that's not what you're indicating to me.

MR. SOSINSKI: No, I'm indicating Tom Katz's (phonetic) deposition on page 36, Your Honor, Exhibit C specifically. They had received an email with, which indicated this is the results of, from the testing of the transformer.

THE COURT: That's an email?

MR. SOSINSKI: That's an email that they had received, yes.

THE COURT: Is this the same fellow?

MR. SOSINSKI: No, that's a different person. He took those two.

THE COURT: But he's telling me the other guy didn't know which transformer it came from. A



transformer.

MR. SOSINSKI: With regards to the second APV, but yes, Your Honor, what they had was an email from IRS after they had tested the liquid from the transformer. That's what IRS had indicated.

THE COURT: And you had no expert to actually sum it up. You have no -- you want me to put the pieces together for you. You want the trier of fact to do it, but you're not doing it with your proofs.

MR. SOSINSKI: Well, Your Honor, I would also like to indicate just with regards to Dimant and everything, that was from a contamination of sorts. We're talking about a spill that you see with your eyes, with a photograph of a transformer that's flipped. And then obviously, contamination. Then you have testimony of individuals of seeing third parties collecting that, emergency responses collecting that, and acquiring all of the contamination, and testing it, and even the slightest amount with a homogenized amount would still be 9.5 parts per day, which is over, over the amount.

THE COURT: You're linking the blocks. You would agree, I mean, even if the Court says itself that experts are generally needed in these type of cases.

MR. SOSINSKI: Well, Your Honor, in this

instance, I would disagree, because we see what we see. And an expert would only be able to opine on so much. They would be opining on the same testing --

THE COURT: So I could just look at an X-ray and tell that that broken bone came from that particular accident.

MR. SOSINSKI: No, but you could just look at a list of numbers and say that's over a specific amount that is needed in order to at least check and acquire, and retain an LSRP in order to do the testing to see if there's contamination on the property. Pursuant to the Spill Act -- from the testimony of counsel, he's saying that there's no contamination on the property. He hasn't proven that, unless there has been some sort of testing.

THE COURT: He hasn't proven that there's no contamination.

MR. SOSINSKI: Well, he indicated there's no contamination and he disputes that. I’m looking at a case, it's an unpublished case, but the facts are interesting. Emerald Bay Developers LLC versus Lenyk Auto Inc. Case involved limestone slabs stored outdoors on plaintiff’s property that became discolored after Hurricane Irene in 2011. In that case, let me give you the proofs.



As a result of the hurricane, the area was flooded, heavily flooded and there was limestone stored on plaintiff's property. Next door property, adjacent to the Emerald Bay. Let me see, oh, it's the auto place. LA, the limestone place, I'm sorry, the auto place, had two above ground storage tanks on its property. One tank contained waste motor oil, and the other contained fuel oil used to heat their building.

As a result of the hurricane, the area was flooded. The limestones became discolored and allegedly unusable. Plaintiffs attributed the discoloration to oil they presumed had leaked from LA's tanks and infiltrated the limestone. After the hurricane passed and the rain stopped, observation of his property observed oil slicks on the property and accumulated water about three and one half feet high.

He took photographs of the oil slicks on his property. He observed oil stains throughout his parking lots and driveways. He noticed limestone slabs were stained with black oil. He observed both tanks were tipped over on their sides, okay? So he makes all these observations. The obvious, perhaps, conclusion is that the oil spilled, and it stained the limestones and contaminated the property.

That Court granted summary judgment to the

defendant, and it goes through the analysis, because there was no causation. Appellate Division, we agree with the trial court that the plaintiff's failure to marshal expert proof of causation to support their liability claims, in this case, is a fatal defect, and that their claims cannot be solely founded upon the guy's lay observations of certain conditions he observed on the site after the hurricane.

The causal nexus between the oil stored in the LA tanks and the discoloration of plaintiff's limestone is a subject beyond common knowledge. Ford Motor Credit versus Mendola, 427 New Jersey Super 226. Including expert testimony was necessary to address subject matter beyond the general public's familiarity.

The claimed linkage between the storage of oil in LA's tanks, the alleged leakage from those tanks after they tipped over in the storm, the actual composition and sources of the oil slicks observed, and the odor smelled by the Ropers (phonetic) after the storm, and the chemical processes that produced the observation observed discoloration of limestones are all matters requiring persuasive expert testimony.

Plaintiff unwisely attempted to litigate this case without such critical expert proof. They said it was speculation, even with all that stuff.



MR. SOSINSKI: Even with all that stuff, and in no way I think I heard that they solved the spill, correct? What they said was just oil stains on limestone, oil stains that could be from any sort of tanks.

THE COURT: Well, the case was --

MR. SOSINSKI: What we see from the photographs is a leak, is a leaking transformer, Your Honor. This is not the same as something where there's a possibility that maybe those oil leaks came from there.

THE COURT: Nobody is saying there wasn't a leaking transformer. What we're saying is, how do you know the PCPs came from that? Because you don't have an expert telling me that. You just have a test. And the test is based upon all I can see is mixed up oil.

MR. SOSINSKI: No, the test is the first test with regards to testing of the transformer from, and then the second test is the mixed up oil, still above the needed, the recommendations for DEP and the quality, --

THE COURT: The stuff that’s in the tanks --

MR. SOSINSKI: -- water quality standards.

THE COURT: Okay. Well, we just have a differing opinion and it has, how you're proving

causation.

MR. SOSINSKI: I think, Your Honor, you see what you see.

THE COURT: You think I'm wrong. I get it. I get you think I'm wrong. Again, I don’t, I'm scratching my head why you don't have an expert to tell me, to tell the trier a fact. But here we are at summary judgment.

MR. SOSINSKI: Well, Your Honor, we had two DEP employees on the property when the spill, right after the spill occurred. They saw what they saw. They saw contamination. Tests occurred after collecting.

THE COURT: They saw oil. They didn't see contamination.

MR. SOSINSKI: Sure.

THE COURT: You don’t, you can't see contamination.

MR. SOSINSKI: I agree. My apologies, Your Honor. They collected the oil from those transformers, third parties did. They tested it.

THE COURT: Again, --

MR. SOSINSKI: They tested it and there’s contamination.

THE COURT: -- but the testimony that I don't



know where it came from. I don't know which one it came from.

MR. SOSINSKI: Well, Your Honor, realistically, I'm not, regardless of I don't know where it came from, it was collecting, the third parties collected the oil. I'm not really sure, I'm not sure what an expert would say indicating that the truck was cleaned prior, they wouldn't be able to do that 10 years after, you know. What we have is the certifications and the testimony.

THE COURT: You're not seriously arguing about the vacuum truck, are you?

MR. SOSINSKI: No, Your Honor.

THE COURT: I mean, how do you possibly --

MR. SOSINSKI: No, I think --

THE COURT: -- hold him responsible for the contents of an --

MR. SOSINSKI: I'm just coming to the point where you had indicated that a vacuum truck had been used prior, and therefore we don't know. I don't think an expert would be able to opine on if a vacuum truck was cleaned prior to getting onto the property.

THE COURT: In all candor, I'm ruling that out anyway.

MR. SOSINSKI: Sure.

THE COURT: I don't know how anybody proves that, that they took a mixed sample and they're -- but I'm focusing on what proofs you have that the actual one that was open and leaking, that's where the PCP came from, versus somewhere else. I mean, the facts of this case that I just read to you, everybody saw the oil spill, yet the Court is saying, but I can't say affected the --

MR. SOSINSKI: Everyone saw the oil stains, Your Honor.

THE COURT: No, well, he said that the tanks were filled, were spilled over. That was seen. Oil slicks on the ground. So I mean -- okay. Anything further from any of you counsel?

MR. BERGER: Well, I have to tell you, I'm a little confused, Your Honor. Originally, we intended to make a motion at the end of their case, along the lines of Your Honor's discussion that they didn't prove their case. And that's how we thought this case would end. They actually filed a motion for summary judgment, surprised us. And we said, well, they're going to go, we have to go through all this trouble anyway. We may as well cross move.

I don't think Your Honor has addressed the motions for summary judgment, which I'm prepared to do,



and why they should be denied and why ours should be granted.

THE COURT: I haven't made the ruling yet. But I don't know if you've been following along here.

MR. BERGER: I have been.

THE COURT: Okay.

MR. BERGER: But the issues that you seem to be addressing are, I would deem, to be trial issues, as opposed to summary judgment issues. If you're beyond that, and you're, I’m obsessing from what Your Honor is saying, that you don't think they can meet the burden of proof at trial. And if that's the case, that's great news for me. But I don't want to not address the summary judgment issues --

THE COURT: Well, you've asked for summary judgment because they can't make their proofs at trial.

MR. BERGER: Well, that was only one of the reasons. The other reason that they're claiming that we are not the, keep losing the word, we are not the discharger. And the discharger apparently doesn't have any money. And they are alleging that we're the discharger. But the Spill Act says it applies to the discharger or anyone responsible. And they're taking the position that if you own the property, you're responsible.

Well, they argued exactly the other way. And the Court came out and said, no, you need more than ownership. You need to be in control. And we argued judicial estoppel because it's exactly what they, in that case, which was a National Lead case, the State of New Jersey owned the property. National Lead used some of its material to fill some property, I think, in Raritan Bay.

And then National Lead didn't want to pay the whole bill. They wanted the State of New Jersey to pay some of the bill. And in that case, the State of New Jersey argued you need more than just to be owner of the property. You need some control. And Judge Wolfson agreed with that.

THE COURT: I got to be candid with you. I read the NL case. I do not find at all judicial estoppel on their argument that they are making here. Also, I mean, again, judicial estoppel generally is out of litigation and subsequent litigation involving the same essential nexus of facts, not, that was argued here in 19 -- and then now.

So, but NL, a) they didn't win, right, in NL? That argument didn't win, right?

MR. BERGER: It did win.

THE COURT: No, it didn't.



MR. BERGER: Judge Wolfson decided that you needed more than just to be owner of the property to be liable of the spill.

THE COURT: But if they were saying, we're not the owner of the property, and we know that --

MR. BERGER: No, they were. The State of New Jersey was the owner of the property. And National Lead was trying to hold them liable, just because they were owner of the property. And Judge Wolfson said, no, no, no, you needed control. You need more than just ownership. You need control.

They're arguing exactly the opposite to us here. And I do disagree with Your Honor that --

THE COURT: Well, I, they're saying, in this particular case, in our case, that you hired the contractor. You had control over them. You had a contract with them to demolish it. You say, well, it didn't include the tanks. Would it actually? I don't know. But you hired them. They did it. It was on your property. You controlled who was demolishing it. That's how they're linking you to this.

MR. BERGER: Well, but that's not enough. Because in the contract, which they attached to their papers, the guy who was doing the demolition work got to keep all the metal. That was his bonus. That's how

this all came about. The guy sold some transformers. He sold metal. And he removed the transformers trying to get to the metal.

THE COURT: But you hired him.

MR. BERGER: I have to control him. I have to control how he does his work. Just the fact that I hired him, and he's a demolition contractor, doesn't make me liable under the Spill Act. And I think National Lead says that. If you think otherwise, I disagree with you.

THE COURT: I know in National Lead the State argued that ownership at the time of the Spill Act was not enough. I know that. They argued that the Spill Act should not impose liability on land held by the State in trust, because it was underneath the water. Because they had no ability to exclude anybody from that property. But I don't see that as being inconsistent with their argument here, which is --

MR. BERGER: I think it's exactly the opposite. They argued that case that ownership was not enough. And they're arguing in our case that ownership is enough. They don't have any proof that we had any control. The only thing that they argue, they don't even allege in their complaint that we had control. The only thing they allege in their complaint is that



we were the owner at the time of the spill. And they're actually, of the defendants that they sued, the two, the summary judgment motion you have today is against me, and I was never an owner of the property, and Milltown Industrial, which was not an owner of the property at the time of the spill.

So the summary judgment motion against two parties, who even on their argument that ownership is enough, we prevail. Because neither me, nor the entity for which they're requesting summary judgment, were owners of the property at the time of the spill. So I think denying their motion is easy, if I can say so.

Granting our motion, it gets more complicated, because you do get into, if you don't buy the argument of judicial estoppel, which I think is a correct argument, then you get into the weeds of what tests they did, and what did they show by way of, they didn't do any testing of anything that spilled onto the ground, nothing.

They had this homogenized stuff, I think in two tests. You got three transformers, they all agree only one of them leaked. They can't possibly show that whatever PCBs there might have been on the site came from the leaked transformer, because they pumped out all of the carcasses and put it in another bucket.

THE COURT: I guess I don't see the motions being inapposite, in the sense that if I deny their summary judgment motion for the reasons that I think you might be entitled to it, it's one and the same, isn't it?

MR. BERGER: No, because I think their motion for summary judgment should be denied, for reasons that I just said, which is to say that you would have to, on their theory, you would have to be an owner. They claim ownership is enough. We claim ownership is not enough. You need control.

THE COURT: Let me hear from counsel.

MR. BERGER: So that neither party was an owner. So that seems to me their motion should be denied, and for the reasons that Your Honor has suggested before, our motion should be granted, because the owner is not going to learn anything more at trial than they've already presented to you, and they don't have any proof that there was PCBs that came out of the leaked transformer, and that's what they have to prove.

THE COURT: Which is your target defendant?

MR. BERGER: It would be SB Building, Your Honor.

THE COURT: And SB Building was not the owner at the time of the spill but --



MR. SOSINSKI: Correct, SB Milltown was. They merged into SB Building. SB Milltown is a named defendant but they defaulted in this case.

THE COURT: Okay, so --

MR. SOSINSKI: Under Ventron, for example, Your Honor, I believe it was the Woodbridge merged into Ventron, and even Ventron's Supreme Court decided that because they merged into it, they would still be responsible for any of the contamination that occurred once they acquired the company.

THE COURT: Okay, what do you say about that?

MR. BERGER: It isn't a question of responsibility. It's a question at the time of the spill, you need to be, on their theory, if you were owner of the property on the day of the spill, you're liable under the Spill Act, they say, because that's in any way responsible. The defendant to whom they bring a motion for some judgment was concededly not the owner of the property on the day of the spill.

So they didn't satisfy the burden of the Spill Act. It has nothing to do with responsibility, or who's liable, they didn't meet the basic requirements of the Spill Act to give themselves jurisdiction. That's the point.

THE COURT: Okay, did you want to hear, be

heard on the two prong aspect of control and the ownership?

MR. SOSINSKI: No, Your Honor. For the most part, we'll rely on our brief.

THE COURT: Well, are you making it solely on the ownership, or are you --

MR. SOSINSKI: Oh, Your Honor, it's going to be, it would be obviously controlling ownership. I mean, for example, in Marsh, (phonetic) an owner was still viewed liable, even though the contamination occurred on the property from a previous owner. So, for the most part, Your Honor, we have Ventron, we have Marsh, we have Supreme Court, Appellate Court decisions where ownership, if you're an owner and you have control over the property, you're in any way responsible for contamination on the property.

Obviously, SB Milltown contracted with Cobra. Demolition occurred, and then there was merged into SB Building.

MR. BERGER: Your Honor, if I can, they never allege control, they never argue control in the brief. They strictly argue that ownership is enough to make us liable under the Spill Act. And this control thing is being made up today.

THE COURT: Talk to me about unjust



enrichment.

MR. SOSINSKI: Well, Your Honor, as we had indicated through certifications from, from a DEP employee, Shonique Darby, who indicated what the amount of money that DEP had spent on the property in order to attempt to contain the contamination. As you could see, IRS was contracted with Cobra. Seemed as though something had happened with the agreement where they had left the property.

No one at that point decided to continue any sort of cleaning of that contamination or the spill. Therefore, DEP had to incur some costs with regards to paying APV. The amount of money that would include APV's contract, salary costs, and some deal well charges on that, that's a position of $118,000. They were, our position is they're obviously unjustly enriched by not having to remediate or clean the property when the contamination in the spill had occurred.

THE COURT: Okay. And --

MR. BERGER: I obviously don't have to clean a property if there's no spill of hazardous substances. The DEP never had jurisdiction under the Spill Act to start with. They certainly had no authority to spend any money. And there's no proof that there was any

contamination which is how Your Honor came out the very beginning of the hearing suggested that they had no proof that there was a spill of hazardous substances at the property. That's the only basis upon which they have jurisdiction. That's the only basis upon which they can spend money, and have a third party pay that money.

THE COURT: So you're saying that the only way they get unjust is linked to whether or not they can prove the Spill Act violation.

MR. BERGER: Yeah.

THE COURT: I mean, that's his argument, not that you didn't do the work, but that you shouldn't have been there in the first place because you can't prove there's a violation of the Spill Act.

MR. SOSINSKI: And we obviously disagree, Your Honor, from all of our motions.

THE COURT: Okay. Well, you know, I have already expressed to you my problem with your proofs, with the State's proofs. I don't see causation. I don't see an expert, which I believe is necessary in this case, linking your tests to the target container. That link, I believe that missing link, rather, is fatal to the State's prosecution of this case. I don't see that you can prove a violation of the Spill Act.



So because of that, I'm denying your motion for summary judgment on that grounds, and I'm granting it to the defendant on that ground. I don't believe that I've got to get into the other arguments that you have made, solid as they may be, because it's the Court's position that no trier of the fact can conclude there has been a violation of the act for the lack of proofs.

MR. BERGER: Thank you, Your Honor.

THE COURT: Again, and I should state that, you know, while we don't have a trial date, because this is a total handling case of mine, I did meet with counsel before coming out here, and I asked if anybody intended to obtain an expert, or needed anything else on this case, or they were, what we have is what we have going into trial. So it's my determination that what the State has is not enough.

MR. BERGER: Is Your Honor going to issue a written opinion or we're done?

THE COURT: I'm going to issue a written order, and it's basically going to say for the reasons I've put on the record here today, and the case law that I've already cited to, that's what it's going to say.

MR. BERGER: Thank you.

THE COURT: Yes.

MR. SOSINSKI: Thank you, Your Honor.

THE COURT: Okay, folks. Thanks for coming in and obviously, patience with regards to we actually got here to make these arguments. Okay.

MR. BERGER: My preference would always to come in and always be, sit here personally. I think a different impact.

*****



**C E R T I F I C A T I O N**

I, TRACY GRIBBEN, Certified Agency Transcriber, do hereby certify that the foregoing transcript of proceedings in the County of Middlesex, on 09/25/2026, digitally recorded index 10:01:20 to 10:55:58, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded to the best of my knowledge and ability.

*/s/* ***TRACY GRIBBEN*** 143
AOC Number

TRACY GRIBBEN TRANSCRIPTION, LLC October 1, 2026
Date

# EXHIBIT 7

**Valen, Thomas R.**

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Monday, July 27, 2026 12:56 PM
**To:** Valen, Thomas R.
**Subject:** RE: S B Building

That is ok.

I was able to download and then email to him (I don't think it was too large for him to receive). If I have an issue, I will circle back.

Thank you,

Mo

DuaneMorris
www.duanemorris.com
**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

**P:** +1 973 424 2037
**F:** +1 973 556 1380
**C:** +1 973 452 3404

E-MAIL | BIO | VCARD

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Monday, July 27, 2026 12:54 PM
**To:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Subject:** RE: S B Building

Just you. I know he's a lawyer but I'm not comfortable emailing him directly since he is your client.

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Monday, July 27, 2026 12:52 PM

**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Subject:** RE: S B Building

Did you send to Berger?

DuaneMorris
www.duanemorris.com
**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

**P:** +1 973 424 2037
**F:** +1 973 556 1380
**C:** +1 973 452 3404

EMAIL | BIO | VCARD

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Monday, July 27, 2026 11:00 AM
**To:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Subject:** FW: S B Building

Here are the test results.

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

**From:** Matthew Thurston <mthurston@dynamic-earth.com>
**Sent:** Monday, July 27, 2026 8:52 AM
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Cc:** Christopher J. Zieger <czieger@dynamic-earth.com>
**Subject:** RE: S B Building

Good morning Tom,

Please see the link below to the data tables and associated laboratory reports for the sampling conducted at Milltown.

Thanks

Files for EV Boraie Development Milltown 2-130 For

Download All

*Download links will expire on 2026.08.26 08:50 EDT*

By downloading these files, you agree to the Terms and Conditions

**Matthew Thurston**
Environmental Scientist

**Dynamic Earth, LLC**
826 Newtown Yardley Road | Suite 201 | Newtown | PA | 18940
Phone: 267-685-0276 Ext. 3141
NJ | DE | FL | MD | NC | PA | TX
www.dynamic-earth.com
***Licensed Professional Engineers Throughout the United States***

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Friday, July 24, 2026 4:14 PM
**To:** Christopher J. Zieger <czieger@dynamic-earth.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** Re: S B Building

Ok, thanks

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

---

**From:** Christopher J. Zieger <czieger@dynamic-earth.com>
**Sent:** Friday, 24 July 2026 16:11:56
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** RE: S B Building

Still waiting on the porewater PCBs. We will forward a link to download upon receipt. We are still expecting to see them by end of business today. Thanks.

**Christopher J. Zieger, LSRP**
Senior Principal

**Dynamic Earth, LLC**
826 Newtown Yardley Road | Suite 201 | Newtown | PA | 18940

Phone: 267-685-0276 Ext. 3117 | Cell: (732) 413-5716
NJ | DE | FL | MD | NC | PA | TX
www.dynamic-earth.com
***Licensed Professional Engineers Throughout the United States***

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Friday, July 24, 2026 2:32 PM
**To:** Christopher J. Zieger <czieger@dynamic-earth.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** Fw: S B Building

Please forward the results to Mr. Bauer, or to me and I'll pass them along.

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

---

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Friday, 24 July 2026 14:23:36
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>; Mairo, John S. <jmairo@fbtgibbons.com>
**Cc:** lberger@uslandresources.com <lberger@uslandresources.com>
**Subject:** S B Building

Did you receive the test results back?

Pursuant to the order, you are supposed to share the results with us.

Thank you,

Mo

DuaneMorris
www.duanemorris.com

**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

**P:** +1 973 424 2037
**F:** +1 973 556 1380
**C:** +1 973 452 3404

EMAIL | BIO | VCARD

# EXHIBIT 8

**Valen, Thomas R.**

**From:** Valen, Thomas R.
**Sent:** Monday, September 21, 2026 1:57 PM
**To:** Bauer, Morris S.
**Subject:** RE: S B Building

Mo,

Can you send me a copy of your test results from the split samples? Thanks.

-Tom

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

**From:** Valen, Thomas R.
**Sent:** Monday, July 27, 2026 11:00 AM
**To:** Bauer, Morris S. <msbauer@duanemorris.com>
**Subject:** FW: S B Building

Here are the test results.

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

**From:** Matthew Thurston <mthurston@dynamic-earth.com>
**Sent:** Monday, July 27, 2026 8:52 AM
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Cc:** Christopher J. Zieger <czieger@dynamic-earth.com>
**Subject:** RE: S B Building

Good morning Tom,

Please see the link below to the data tables and associated laboratory reports for the sampling conducted at Milltown.

Thanks

Files for EV Boraie Development Milltown 2-130 For

Download All

*Download links will expire on 2026.08.26 08:50 EDT*

By downloading these files, you agree to the Terms and Conditions

**Matthew Thurston**
Environmental Scientist

**Dynamic Earth, LLC**
826 Newtown Yardley Road | Suite 201 | Newtown | PA | 18940
Phone: 267-685-0276 Ext. 3141
NJ | DE | FL | MD | NC | PA | TX
www.dynamic-earth.com
***Licensed Professional Engineers Throughout the United States***

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Friday, July 24, 2026 4:14 PM
**To:** Christopher J. Zieger <czieger@dynamic-earth.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** Re: S B Building

Ok, thanks

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

---

**From:** Christopher J. Zieger <czieger@dynamic-earth.com>
**Sent:** Friday, 24 July 2026 16:11:56
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** RE: S B Building

Still waiting on the porewater PCBs. We will forward a link to download upon receipt. We are still expecting to see them by end of business today. Thanks.

**Christopher J. Zieger, LSRP**
Senior Principal

**Dynamic Earth, LLC**
826 Newtown Yardley Road | Suite 201 | Newtown | PA | 18940
Phone: 267-685-0276 Ext. 3117 | Cell: (732) 413-5716
NJ | DE | FL | MD | NC | PA | TX
www.dynamic-earth.com
***Licensed Professional Engineers Throughout the United States***

---

**From:** Valen, Thomas R. <tvalen@fbtgibbons.com>
**Sent:** Friday, July 24, 2026 2:32 PM
**To:** Christopher J. Zieger <czieger@dynamic-earth.com>; Matthew Thurston <mthurston@dynamic-earth.com>
**Subject:** Fw: S B Building

Please forward the results to Mr. Bauer, or to me and I'll pass them along.

**Thomas R. Valen**
Partner

**FBT Gibbons**
Newark, NJ
Direct +1 973.596.4885
Mobile +1 201.407.4736

---

**From:** Bauer, Morris S. <MSBauer@duanemorris.com>
**Sent:** Friday, 24 July 2026 14:23:36
**To:** Valen, Thomas R. <tvalen@fbtgibbons.com>; Mairo, John S. <jmairo@fbtgibbons.com>
**Cc:** lberger@uslandresources.com <lberger@uslandresources.com>
**Subject:** S B Building

Did you receive the test results back?

Pursuant to the order, you are supposed to share the results with us.

Thank you,

Mo

DuaneMorris
www.duanemorris.com
**Morris S. Bauer**
Partner

Duane Morris LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932-1007

**P:** +1 973 424 2037
**F:** +1 973 556 1380
**C:** +1 973 452 3404

E-MAIL | BIO | VCARD

For more information about Duane Morris, please visit https://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

---

NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email or by calling FBT Gibbons at (513) 651-6800, so that our address record can be corrected.

---

**Disclaimer**

This e-mail is confidential. It may also be legally privileged. If you are not the addressee you may not copy, forward, disclose or use any part of this email text or attachments. If you have received this message in error, please delete it and all copies from your system and notify the sender immediately by return e-mail. Internet communications cannot be guaranteed to be timely, secure, error or virus free. The sender does not accept liability for any errors or omissions. Any drawings, sketches, images, or data are to be understood as copyright protected.

**Disclaimer**

This e-mail is confidential. It may also be legally privileged. If you are not the addressee you may not copy, forward, disclose or use any part of this email text or attachments. If you have received this message in error, please delete it and all copies from your system and notify the sender immediately by return e-mail. Internet communications cannot be guaranteed to be timely, secure, error or virus free. The sender does not accept liability for any errors or omissions. Any drawings, sketches, images, or data are to be understood as copyright protected.